IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| SHLOMO LEIBOVITCH, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 08 C 1939 |
| | ) | |
| THE SYRIAN ARAB REPUBLIC, | ) | |
| et al., | ) | |
| | ) | |
| Defendants. | ) | |

# OPINION, FINDINGS OF FACT AND CONCLUSIONS OF LAW

## I. INTRODUCTION

### A. Nature of the Case

This is a civil action pursuant to the Foreign Sovereign Immunities Act

("FSIA"), 28 U.S.C. §1605A.  On June 17, 2003, the Leibovitch family was

traveling along the Trans-Israel Highway, just west of the town of Kalkilya, Israel.

Members of the Palestine Islamic Jihad ("PIJ") terrorist organization opened fire

with Kalashnikov machine guns and pistols on the family's Mazda mini-van

(hereinafter the "Terrorist Attack"). Decedent Noam Leibovitch, seven years old, was murdered and her sister, plaintiff Shira Leibovitch, a United States citizen then three years old, was severely injured in the Terrorist Attack. The other family members survived the attack.

Plaintiffs, who include all the shooting victims and the estate of decedent Noam Leibovitch, seek damages against the Islamic Republic of Iran ("Iran") and the Iranian Ministry of Information and Security ("MOIS") for their provision of material support and resources to the PIJ. Plaintiffs' complaint also named as defendants the Syrian Arab Republic, the Syrian Ministry of Defense, high ranking members of the Iranian and Syrian regimes, and the PIJ. However, on March 16, 2009, plaintiffs voluntarily dismissed the Syrian defendants. On April 23, 2009, the individual Iranian defendants and the PIJ were dismissed for failure to serve them with summons.

Plaintiffs filed suit on April 3, 2008. Plaintiffs effected service on Iran and MOIS via diplomatic means pursuant to 28 U.S.C. § 1608. The United States Department of State provided records of transmittal of service and diplomatic notes confirming effectuation of service. Although properly served with process

pursuant to 28 U.S.C. §1608, defendants failed to respond or appear, and this court

entered a default order against Iran and MOIS on April 23, 2009.

### B. Jurisdiction

After examining the proofs, the court ordered plaintiffs to show cause as

to why the claims of the Israeli citizens based on Israeli law should not be

dismissed for want of jurisdiction. The only American citizen injured in the

terrorist attack was Shira Leibovitch. Subject matter and claim jurisdiction exists

by virtue of 28 U.S.C. §§ 1605A(a) and (c) which provide in part as follows:

(a) **In general.--**

> (1) **No immunity.**--A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case not otherwise covered by this chapter in which money damages are sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act or provision of material support or resources is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency.

> (2) **Claim heard.**--The court shall hear a claim under this section if --

(A)(i)(I) the foreign state was designated as a state sponsor of terrorism at the time the act described in paragraph (1) occurred, or was so designated as a result of such act, and, subject to subclause (II), either remains so designated when the claim is filed under this section or was so designated within the 6-month period before the claim is filed under this section;

\* \* \*

(ii) the claimant or the victim was, at the time the act described in paragraph (1) occurred--

(I) a national of the United States; . . .

\* \* \*

(c) **Private right of action**.--A foreign state that is or was a state sponsor of terrorism as described in subsection (a)(2)(A)(i), and any official, employee, or agent of that foreign state while acting within the scope of his or her office, employment, or agency, shall be liable to--

(1) a national of the United States,

(2) a member of the armed forces,

(3) an employee of the Government of the United States, or of an individual performing a contract awarded by the United States Government, acting within the scope of the employee's employment, or

(4) the legal representative of a person described in paragraph (1), (2), or (3),

for personal injury or death caused by acts described in subsection (a)(1) of that foreign state, or of an official, employee, or agent of that foreign state, for which the courts of the United States may maintain jurisdiction under this section for money damages. In any such action, damages may include economic damages, solatium, pain and suffering, and punitive damages. In any such action, a foreign state shall be vicariously liable for the acts of its officials, employees or agents.

The FSIA establishes subject-matter and personal jurisdiction over foreign states and their officials, agents, and employees in certain enumerated instances. Specifically, the FSIA eliminates the sovereign immunity of foreign states designated as state sponsors of terrorism and permits civil actions "in which money damages are sought against a foreign state for personal injury or death that was caused by . . . extrajudicial killing . . . or the provision of material support or resources for such an act if such act or provision of material support is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency." 28 U.S.C. §1605A(a)(1).

The FSIA also creates a "private right of action" for United States nationals. 28 U.S.C. §1605A(c). In actions brought under the cause of action

codified at §1605A(c), American citizens harmed by state-sponsored terrorism may seek "money damages" including "economic damages, solatium, pain, and suffering, and punitive damages." *Id*.

The plaintiffs who are not United States nationals contend their claims can be heard by the court based on supplemental jurisdiction over their non-statutory claims. 28 U.S.C. § 1367(a). The only case plaintiffs cite in support of supplemental jurisdiction is *Pugh v. Socialist People's Libyan Arab Jamahiriya*, 290 F. Supp. 2d 54, 60-61 (D.D.C. 2003), *appeal dismissed*, 112 F. App'x 756 (D.C. Cir. 2004) (in suit by terrorism victims, common law tort claims for property damage brought by corporate owner of airliner which was bombed by Libya's agents arose from the same case or controversy as claims of individual plaintiffs). However, in the *Pugh* case, the claim was made by an American corporation and foreign law was not involved. Without deciding whether or not supplemental jurisdiction is compatible with the defined limits of the FSIA terrorism exception, supplemental jurisdiction will be declined based on §§ 1367(c)(1) and (2) which provide that the court may decline to hear claims that raise complex questions of state (Israeli) law and/or ones that would predominate over the claims which provide original jurisdiction. Accordingly, the claims of plaintiffs other than the

claims of Shira Leibovitch will be dismissed without prejudice for want of jurisdiction.

## C. FSIA Default Standard

The FSIA requires that a default judgment against a foreign state or agency thereof be entered only after claimant "establishes his claim or right to relief by evidence satisfactory to the court." 28 U.S.C. § 1608(e). The satisfactory evidence standard contained in § 1608(e) is the same as the standard for entry of default judgments against the United States government presently set forth in Fed. R. Civ. P. 55(d). *Moore v. United Kingdom*, 384 F.3d 1079, 1090 (9th Cir. 2004); *Hill v. Republic of Iran*, 328 F.3d 680, 683 (D.C. Cir. 2003); *Calderon-Cardona v. Democratic Republic of Korea*, 723 F. Supp. 2d 441, 444 (D.P.R. 2010). Plaintiffs may establish their proof in FSIA default judgment proceedings via affidavits and expert reports. *Anderson v. Islamic Republic of Iran*, __ F. Supp. 2d __, 2010 WL 4871189 *3 (D.D.C. Dec. 1, 2010); *Estate of Botvin ex rel. Ellis v. Islamic Republic of Iran*, 604 F. Supp. 2d 22, 26 (D.D.C. 2009); *Wachsman v. Islamic Republic of Iran*, 603 F. Supp. 2d 148, 155, 162 (D.D.C. 2009).

Plaintiffs have submitted expert testimony from Patrick Clawson, Ph.D., of the Washington Institute for Near East Policy, and Brigadier General Yosef Kuperwesser, a recently retired career Israeli military intelligence officer who at the time of the Terrorist Attack served as the head of the research department in Israeli military intelligence, concerning the PIJ, Iran's support for terrorism generally, and Iran's provision of material support to the PIJ through MOIS.

Additionally, Gen. Kuperwasser provided testimony regarding the structure and operations of the PIJ cell that carried out the Terrorist Attack, on the basis of the documents contained in the Israeli criminal court file of two of the perpetrators, who were captured and convicted of the Terrorist Attack on plaintiffs.

Plaintiffs also submitted extensive documentary evidence such as United States government reports, publications, and other information, concerning the PIJ, Iran, and MOIS.

## II. FINDINGS OF FACT

Based on the evidence submitted the court finds the facts to be as follows:

## A.  Liability

1.  Patrick L. Clawson, Ph.D., is an expert on the Islamic Republic of Iran, its sponsorship of terrorism, and its politics.  Declaration of Dr. Patrick L. Clawson.  Dr. Clawson has over three decades of experience in Iranian affairs and has spent twenty-five years consulting for United States government agencies, including the Central Intelligence Agency, the Department of Defense, the State Department Bureau of Intelligence and Research, the National Security Agency, and the Defense Intelligence Agency.  He has extensive academic experience and has published twenty seven books and monographs dealing with the Middle East and Iran.  He has been qualified as an expert witness in many terrorism trials in federal courts.

2.  The *Harakat al-Jihad al-Islami al-Filastini* or the Palestinian Islamic Jihad ("PIJ") was founded in the 1970s by a group of Palestinian students in Egypt. The organization, led by Fathi Shiqaqi, was loosely affiliated with the larger Egyptian Muslim Brotherhood movement, but had a considerably different ideology.  Whereas the Brotherhood concentrated on encouraging a return to fundamentalist Islamic practices, the PIJ put priority on the struggle against Israel,

which it saw as the key to the unification of the Arab and Islamic world. The PIJ views Israel as the front line of the global conspiracy against Islam.

3. Since 1985, Iran has been continuously listed in the United States State Department's list of state sponsors of terrorism, in a list provided to Congress each year as required by 22 U.S.C. § 2656f(a). Iran uses various organizations to carry out its terrorist support activities. Iran's Ministry of Information and Security ("MOIS") was the successor to the Shah's Organization for Information and Security. MOIS is a major Iranian agency designated by Iran to help organize Iranian government support for the PIJ. With approximately 30,000 employees, MOIS is the largest intelligence agency in the Middle East. Credible reports in the last decade have estimated MOIS's annual budget to be between approximately $100 and $400 million. The United States Department of State has concluded that Iranian intelligence services facilitate and direct terrorist attacks.

4. Plaintiffs presented affidavit testimony of retired Israeli Brigadier General Yosef Kuperwasser. Gen. Kuperwasser served for over three decades as an Israel Defense Forces officer concentrating in intelligence and has been involved in gathering and analyzing intelligence and reporting to the highest

echelons of the Israeli government. He reviewed the Israeli Military Court files (indictments, pleadings, and transcripts) in which the PIJ terrorists who committed the shooting attack on the Leibovitch family were convicted.

5. Iran's financial support for the PIJ increased significantly in late 2000, with the outbreak of the campaign of violence in Israel, the West Bank, and the Gaza Strip commonly known as the Intifada, which lasted until approximately 2005. During the Intifada, the PIJ, along with other Palestinian terrorist groups, carried out hundreds of bombings, shootings, and other violent attacks against Israeli targets in Israel, the West Bank, and the Gaza Strip.

6. In approximately 2000, the PIJ leader in the West Bank town of Kalkilya, Akaf Faiz Nazal, inducted Samach Shubaki into the PIJ. In approximately May 2003, Samach Shubaki instructed Tarek Hassain (whom Samach Shubaki had earlier inducted into the PIJ) to establish a PIJ terrorist cell. Hassain established the PIJ terrorist cell, which was led by him and also included: Samach Shubaki, Ibrahim Atiya, Mahmoud Abu Dura, Mahmoud Atiya, and Amar Shubaki, who was in charge of handling the cell's finances. In April 2003, Samach Shubaki contacted the Secretary of the PIJ's headquarters in Damascus, known to him as "Mohanad," introduced himself as one of Faiz Nazal's operatives,

and requested that Mohanad provide funds for the PIJ operations. A month and a half later, Mohanad transferred funds (in dinars) to the account of Amar Shubaki. During this period, Amar Shubaki transferred sums of several thousand dinars, which he received from the PIJ headquarters in Damascus, to Samach Shubaki, which the latter used to pay salaries to members of the Kalkilya PIJ Cell. Likewise, Amar Shubaki transferred 7,000 dinars to Hassain in order to purchase two Kalashnikov machine-guns, two pistols, and loaded clips for all four weapons.

7. In May 2003, soon after the Kalkilya PIJ Cell was formed, Hassain and Abu Dura developed a plan to carry out a shooting attack on an Israeli vehicle traveling on the Trans-Israel Highway, a major north-south artery that in places runs just along the Israeli side of the border between Israel and the West Bank. Hassain and Abu Dura thereafter reconnoitered at the border wall that divides the Trans-Israel Highway from the West Bank in the area of Kalkilya, and located a drainage channel passing through the wall that was sealed with a metal grating. Hassain and Abu Dura concluded that the grating could be cut, thereby creating a passage onto the Highway. Hassain then summoned the other members of the Kalkilya PIJ Cell to a meeting at a café in Kalkilya, informed them of the shooting plan, and assigned each cell member a role in the attack. At that meeting, Hassain

assigned Samach Shubaki and Amar Shubaki to cut the metal grating, and designated Amar Shubaki as the driver for the attack. Hassain appointed himself, Abu Dura, and Mahmoud Atiya as the shooters, and Ibrahim Atiya as the look-out.

8. On the evening of June 17, 2003, Samach Shubaki and Amar Shubaki cut through the iron grating in the drainage channel in the wall bordering the Trans-Israel Highway. Later that evening, the members of the Kalkilya PIJ Cell, except for Samach Shubaki, returned to the border wall by car with the Kalashnikov machine guns, pistols, and ammunition purchased by Hassain. Upon arriving at the drainage channel in the border wall, at about 11:00 p.m., Hassain, carrying a Kalashnikov, and Mahmoud Atiya and Abu Dura, each carrying a pistol, passed through the channel and approached the Trans-Israel Highway. The three lay prone on the sand, about four meters from the edge of the Highway, and waited for an Israeli vehicle to pass. The Leibovitch's vehicle, a Mazda MPV, license no. 9369509, driven by Shlomo Leibovitch, approached on the Trans-Israel Highway. Hassain opened fire emptying an entire clip toward the Leibovitchs' vehicle. At the same time, Mahmoud Atiya and Abu Dura opened fire with the pistols. Noam Leibovitch was killed and Shira Leibovitch was wounded in the shooting.

9. About ten days after the attack, Samach Shubaki, along with another PIJ operative, distributed approximately 800 flyers in the Kalkilya open market taking responsibility for the Terrorist Attack on behalf of the PIJ. Hassain and Samach Shubaki were later captured by Israeli law enforcement authorities and confessed to and provided details of the Kalkilya PIJ Cell and the Terrorist Attack.

10. On November 11, 2004, Hassain confessed in open court to charges of intentionally causing the murder of Noam Leibovitch, membership in the PIJ, and related charges. On December 20, 2004, Hassain was sentenced to life imprisonment plus twenty years. On October 19, 2005, Samach Shubaki confessed in open court to charges of abetting the murder of Noam Leibovitch, membership in the PIJ, and illegal weapons possession. The same day, he was sentenced to life imprisonment.

11. Iran continues to be the world's most active state sponsor of terrorism. Iran is the PIJ's primary source of assistance, providing money, weapons, safe haven and training. The PIJ is designated by the United States Department of State as a Foreign Terrorist Organization.

## B. Damages

12. The court received affidavit testimony from each of the plaintiffs. Also, the plaintiffs presented expert medical testimony in the form of affidavits and reports from Dr. Alan Friedman and Dr. Rael Strous.

13. At the time of the attack, Shira Leibovitch was three years old. She was sitting in the third row of the family's minivan. The bullet that killed Noam also entered Shira's body and shattered the bones in her right wrist as well as all the muscles and bones in her hand. Had the bullet not lost momentum in Noam's body it would likely have severed Shira's spinal cord. Shira is convinced that Noam saved her life by blocking the bullet that could have caused more harm. Shira had two surgeries on her hand and may require another in the future. As a result of the injury, at the age of 7, Shira had to stop using her right hand and learn to become left handed. Shira has major scarring from the wound and has little strength in her right hand. It will not fully grow. There was no injury to Shira's spine though the bullet went through her hand to the spine. After years of physical therapy for her hand, Shira continues to attend art therapy for emotional support. Galit Leibovitch, Shira's mother, reports that doctors have informed the family that Shira will never recover from the disability to her right hand. When Shira returned

to kindergarten, she had only one functioning hand. While at the hospital and during her therapy Shira became very needy and regressed emotionally. Shira, at age 7, returned to using diapers.

14. Shira still suffers from post-traumatic stress disorder. She continues to be terrified by the sight of blood, Jerusalem (which she associates with the Terrorist Attack), and even a skeleton that was exhibited in her science class. Shira is constantly anxious and has developed a tick in her back and head. Shira is terrified of being left alone and suffers from anxiety attacks. Recently, Shira started attending psychological therapy again. At times Shira becomes very emotional about her disabled right hand. When she is unable to do things like her friends, she becomes very frustrated. When other children ask about her hand, she becomes embarrassed. She is very sensitive about her disability and it makes her feel out of place.

15. Plaintiffs presented the expert report of Dr. Alan Friedman, an experienced medical doctor with an extensive history of treating victims of violent trauma, including gunshot wounds, in both the United States and in Israel. Dr. Friedman personally examined Shira and reviewed her medical reports from Schneider's Children's Hospital, Sheba Hospital, the evaluation and decision of

the Israeli National Health Insurance Institute, and the report of Dr. Batia Yasfe. The reports indicate that a bullet was lodged in the transverse process of the L3 vertebra. Additionally, Shira suffered a fracture of the arch of vertebra L3-4. Shira had emergency surgery to remove the bullet fragment. The next morning it was discovered that she had injuries to the radial and ulnar arteries as well as a crush fracture of the distal right radius. Shira remained in Schneider's Children's Hospital for ten days and received approximately one year of physical and occupational therapy three times a week. For most of the year, her hand was in a cast, bandage, or splint. She became unable to use her right hand, which had been dominant.

16. Despite almost a year of therapy, Shira remained unable to effectively flex her right wrist and fingers. In April 2004, she had additional surgery at Sheba Medical Center. She then received two more months of physical therapy. Shira experienced severe pain and received morphine for the ten days she was in the hospital and an additional three weeks of pain medication at home. Initially, Shira suffered decreased sensation in the fingers of her right hand, but subsequently the sensation has returned to almost normal. Shira continues to suffer weakness in her right hand which has been repeatedly documented. She has

no spinal cord injury. Several years ago, Shira was informed that her right hand would not grow at the proper rate or size. Her right hand is now significantly smaller than the left hand. Shira continues to have several scars on her right wrist, which are evidenced in the photographs attached to Dr. Friedman's report.

17. Dr. Friedman found that Shira's "strength is markedly diminished in the right hand grip (she is unable to make a fist with this hand)." She also suffers reduced sensation in several fingers from the palm to the tip of her finger and around the wrist scars. The right hand has considerable atrophy and "shortening." Shira's range of motion is also diminished in her right hand significantly. Dr. Friedman summarized the "implications" of Shira's injuries:

> Shira has atrophy and decreased range of motion of the right
> upper limb. Although she is now left-hand dominant, it took
> time to train her to do so. The right hand is not fully functional.
> She has weakness and sensory loss. The loss of sensation puts
> her at risk for burns and other injuries in the hand as she is less
> able to protect it. This sensory neuropathy also predisposes her
> to at least the two following risks: Vascular injuries and trauma-
> as these same nerves also travel with those that supply the blood
> vessels. This will be exaggerated if she develops diabetes
> mellitus or another vascular disease later in life, and will put
> her at risk of complicated vascular disease or even amputation.
> Should something occur to the left hand she would be in trouble.

Dr. Friedman also indicated "Shira was obviously in extreme pain as a result of the shooting injuries and surgeries. This has passed, but she may very well need additional surgery/ies on the right upper limb in the future. She will then--once again--have to endure the same process of pain, rehabilitation, and training. If there are complications with the surgeries or healing, it is possible that having to suffer through the entire process over again could be an even more painful experience for her."

18. Dr. Strous evaluated Shira following a personal interview and review of her medical records. Dr. Strous indicates that Shira informed him that she really misses Noam. She remembers playing with her. Although sometimes the memories are vague, she has memories of some specific events. Shira feels that Noam is lacking in her life and remembers being concerned why Noam did not visit with her in the hospital since they were very close. She also misses having a older sister close to her age. Shira told Dr. Strous that she has difficulty meeting new children because they always ask why one of her hands is smaller than the other. This embarrasses her. She realizes that she may be this way for the rest of her life. Shira informed Dr. Strous that she has come to recognize her physical impairments, including her inability to open bottles and play on "monkey

bars." The therapies she endured following the Terrorist Attack were extremely

painful for her and often caused her to cry during the hour and a half rehabilitation

treatment process. Following the attack, Shira became anxious and generally

fearful. She could not tolerate loud noises and would withdraw on hearing them.

19. Dr. Strous summarized his observations as follows:

Shira Leibovitch is a 9-year-old female with signs of chronic
PostTraumatic Stress Disorder (PTSD) and complicated
bereavement since a shooting event over six years ago in which
her 7-year-old sister was killed and she was injured with chronic
resulting disability and deformity to her right hand. In addition,
a bullet was removed from her back, close to her spinal column.
The diagnosis of chronic PTSD is evidence by the presence of
nightmares, generalized anxiety and heightened emotional
reactivity (increased startle reflex). She endured extended
periods of psychotherapy (mostly individual in the form of art
therapy). Shira is well aware of her disabilities and deformity in
hand and this is becoming increasingly more difficult for her
from a social perspective.

20. Dr. Strous indicated Shira's prognosis:

Shira Leibovitch continues to be considerably affected by the
chronic disability and deformity to her hand as well as
psychological distress in the form of PTSD and prolonged
bereavement. It is clear that much of her difficulties will be
compounded when she comes to understand that Noam stopped
the bullet from its full impact on Shira and her death may have
saved Shira from paralysis and even death. Based on these
persistent features of chronic PTSD, it is my opinion that despite
some expected continued improvement over the years she will
continue in the future to suffer chronic symptomatology in the

aftermath of the shooting despite considerable time having
elapsed since the event.

Dr. Strous diagnosed Shira has having moderate chronic post traumatic distress
disorder and dysthymia.

### III.  CONCLUSIONS OF LAW

### A.  Liability

1.  Plaintiff's extensive expert testimony and documentary evidence
"establishes [her] claim or right to relief by evidence satisfactory to the court."
28 U.S.C.§ 1608(e); *Moore*, 384 F.3d at 1090; *Hill*, 328 F.3d at 683; *Calderon-
Cardona*, 723 F. Supp. 2d at 444.  As this court is authorized to accept
uncontradicted affidavit and documentary evidence, *Anderson*, __ F. Supp. 2d
at __, 2010 WL 4871189 at *3; *Botvin*, 604 F. Supp. 2d at 26; *Wachsman*, 603
F. Supp. 2d at 155, 162, and since no objection has been interposed by defendants,
who failed to appear in this matter, this court adopts the testimony of Dr. Clawson
and Brig. Gen. Kuperwasser as stated above.  Accordingly, the Court finds that
plaintiff has offered sufficient evidence and has met the standard sufficient to
establish a her case.

2. This court has original subject matter jurisdiction over suits under the FSIA against foreign states which are not entitled to immunity. 28 U.S.C. § 1330(a); *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428 (1989). The FSIA lifts the immunity of foreign states and agencies thereof for actions "in which money damages are sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act." 28 U.S.C. §1605A(a)(1). The FSIA further provides, in relevant part, that the "court shall hear a claim under this section if . . . the claimant or the victim was . . . a national of the United States." 28 U.S.C. §1605A(a)(2)(ii)(I).

3. Shira Leibovitch is a United States national. Accordingly, the court has jurisdiction both over the claims of Shira as a direct "victim" and as a "claimant" asserting claims related to the death of Noam. *Acosta v. Islamic Republic of Iran*, 574 F. Supp. 2d 15, 26 (D.D.C. 2008) (immunity is abrogated and subject matter jurisdiction is conferred for claims under the FSIA if "either the plaintiff *or* the victim [is] a U.S. national at the time the act of terrorism occurred").

4. Plaintiff's injuries were caused by "an act of . . . extrajudicial killing" within the meaning of 28 U.S.C. §1605A(a)(1). The shooting attack carried out by the PIJ on June 17, 2003, which caused injuries to Shira and her family, was an act of extrajudicial killing within the meaning of §1605A(a)(1) because Noam Leibovitch was killed in the attack.

5. The evidence clearly shows and the court finds and concludes that Iran and the MOIS provided "material support or resources" to the PIJ, within the meaning of 28 U.S.C. § 1605A, for the specific purpose of carrying out acts of extrajudicial killing such as the shooting in which Noam Leibovitch was killed and her family was harmed. The court also concludes that Iran was designated as a state sponsor of terrorism by the United States both at the time that Iran provided the PIJ with material support and resources and at the time of the shooting. Therefore, this court has jurisdiction over this action and defendants are not immune from this action. *Belkin v. Islamic Republic of Iran*, 667 F. Supp. 2d 8, 19 (D.D.C. 2009).

6. The court concludes that Iran and MOIS are vicariously liable as aiders and abettors and coconspirators for the June 17, 2003 shooting attack committed by the PIJ. As detailed above, for at least several years preceding the

shooting, Iran, MOIS, and the PIJ acted in concert and pursuant to a joint policy to facilitate and carry out such attacks, in order to achieve shared goals and purposes, and Iran and MOIS provided funds and other material support that aided and abetted such attacks. Iran and the PIJ have openly proclaimed the existence of their alliance and its goals. Moreover, the very provision of funds by Iran and MOIS to the PIJ and its operatives with the intention of enabling the commission of terrorist attacks clearly bespeaks a conspiracy to commit such attacks, and aided and abetted such attacks.

### B. Damages

7. There is guidance from prior FSIA cases on each of the types of harm plaintiff Shira has suffered. Direct victims harmed by terrorist attacks have been awarded $5 -15 million for their own pain and suffering. *See Campuzano v. Islamic Republic of Iran*, 281 F. Supp. 2d 258, 274-76 (D.D.C. 2003); *Blais v. Islamic Republic of Iran*, 459 F. Supp. 2d 40, 59 (D.D.C. 2006); *Peterson v. Islamic Republic of Iran*, 515 F. Supp. 2d 25, 52-53 (D.D.C. 2007). Courts hearing FSIA cases have awarded a range of damages for direct victims of terrorist attacks. *Kirschenbaum v. Islamic Republic of Iran*, 572 F. Supp. 2d 200, 213 (D.D.C. 2008) ($5 million for pain and suffering to American victim of Israeli

terrorist bombing whose body was penetrated by multiple physical objects, requiring several surgeries and physical therapy and accompanied by long-lasting emotional effects); *Campuzano*, 281 F. Supp. 2d at 274-76 (awards ranging from $7 - $15 million to victims for past and future pain and suffering, loss of prospective income, and past medical expenses); *Blais*, 459 F. Supp. 2d at 59 ($20 million award for pain, suffering, and mental anguish); *Peterson*, 515 F. Supp. 2d at 52-53 (26 injured survivors of the 1983 Beirut attack were awarded between $1.5 million and $12 million for battery). As a result of her youth and the long duration of the permanent injuries, Shira is entitled to damages at the upper range of the FSIA scale.

8. As an American citizen, Shira has a direct cause of action under 28 U.S.C. §1605A. She has suffered in multiple ways from the attack. She has a permanent disability and disfigurement that will endure for the rest of her life. She suffers the psychological and emotional trauma of coming under fire from vicious terrorists. She has lost her sister Noam, with whom she was very close. Her family life has been permanently disrupted. Shira's childhood and her past and future relationship with her parents, siblings, and grandparents has been marred.

9.  Siblings of those murdered in terrorist attacks have been awarded $2.5 million in FSIA cases. *Acosta*, 574 F. Supp. 2d at 30 ($2.5 million to assassination victim's brother for pain and suffering); *Peterson*, 515 F. Supp. 2d at 52 ($2.5 million for pain and suffering to siblings and half-siblings of servicemen killed in 1983 Beirut bombing); *Bodoff v. Islamic Republic of Iran*, 424 F. Supp. 2d 74, 86-88 (D.D.C. 2006) ($2.5 million to each sibling), *Ben-Rafael v. Islamic Republic of Iran*, 540 F. Supp. 2d 39, 59 (D.D.C. 2008) ($2.5 million to each of decedent's sisters).  As a sibling losing Noam in the brutal attack, Shira is entitled to loss of solatium damages in the range set by prior FSIA cases.  Additionally, Shira suffered loss of solatium with respect to each member of her immediate family and both grandparents.  Shira's loss of solatium is compounded and multiplied by the fact that her relationship with her two parents, two siblings and two grandparents have been impacted and are severally strained. A larger loss of solatium award is appropriate.

10.  Compensatory damages in the amount of $17,500,00 will be awarded.

11.  Under current law, plaintiff may obtain punitive damages against both Iran itself and MOIS.  28 U.S.C. § 1605A(c); *Oreissi v. Islamic Republic of*

*Iran*, 573 F.3d 835, 840 (D.C. Cir. 2009); *Beer v. Islamic Republic of Iran*, 2010 WL 5105174 *1 (D.D.C. Dec. 9, 2010).  In civil terrorism cases tried under FSIA, judges have awarded punitive damages to punish defendants and to deter future acts of terrorism.  Courts have imposed punitive damage of three times Iran's annual budget for the export of terrorism. *See Beer*, 2010 WL 5105174 at *16; *Acosta*, 574 F. Supp. 2d at 31; *Bodoff*, 424 F. Supp. 2d at 89.  Recent Supreme Court precedent, however, has reemphasized the importance of considering the ratio between compensatory and punitive damages. *See Exxon Shipping Co. v. Baker*, 554 U.S. 471 (2008); *Beer*, 2010 WL 5105174 at *17; *Rimkus v. Islamic Republic of Iran*, ___ F. Supp. 2d ___, 2010 WL 4628317 *18-19 (D.D.C. Nov. 16, 2010).  Still, there is no strict ratio and three guideposts are to be considered in evaluating the constitutionality of a punitive damages award:  "the reprehensibility of the action in question, the ratio between the compensatory and punitive damages, and the parallel remedies available." *Kunz v. DeFelice*, 538 F.3d 667, 679 (7th Cir. 2008); *Bunton v. Cape Cod Vill., LLC*, 2009 WL 2139441 *3 (C.D. Ill. July 6, 2009).  Here, the conduct involved reaches the extreme limits of reprehensibility.  Nevertheless, this is a case in which substantial compensatory damages are being awarded so that a high ratio is not necessary for there to be a

substantial punitive damages award. Also, numerous punitive damages awards have been made against Iran, MOIS, or their underlings for supporting terrorism. *Cf. **Rimkus***, 2010 WL 4628317 at *18. Another such award will not significantly add to the deterrent effect of punitive damages. Considering the extreme reprehensibility of defendants' conduct and the wealth of defendants, a punitive damages award that is double the compensatory damages is appropriate.

12. Punitive damages in the amount of $35,000,000 will be awarded.

13. This court possesses subject matter jurisdiction over this action and personal jurisdiction over defendants. Plaintiffs have established to the court's satisfaction, and by clear and convincing evidence, that defendants, the Islamic Republic of Iran and its Ministry of Information and Security, are jointly and severally liable for all damages awarded by this court for their provision of material support and assistance to the terrorists that carried out the July 17, 2003 shooting attack in which plaintiff was injured. Accordingly, a default judgment shall be granted and judgment shall enter in the amount stated below.

IT IS THEREFORE ORDERED that the Clerk of the Court enter judgment as follows:

1.  Dismissing all named defendants other than the Islamic Republic of Iran and the Iranian Ministry of Information without prejudice.

2.  Dismissing without prejudice the individual claims of all plaintiffs except Shira Leibovitch by her guardians Shlomo and Galit Leibovitch for want of jurisdiction.

3.  Entering a judgment in the amount of $52,500,000, which include $17,500,000 compensatory damages and $35,000,000 punitive damages, in favor of plaintiffs Shlomo Leibovitch and Galit Leibovitch, not individually but as guardians of Shira Leibovitch, a minor, jointly and severally against the Islamic Republic of Iran and the Iranian Ministry of Information and Security.


ENTER:


William T. Hart
UNITED STATES DISTRICT JUDGE


DATED:  FEBRUARY 1, 2011