# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

SHLOMO LEIBOVITCH, et al.,    )
          )
    **Plaintiffs,**    )
          )    **No. 08 C 01939**
   **v.**    )
          )    **Chief Judge Ruben Castillo**
THE SYRIAN ARAB REPUBLIC, et al.,    )
          )
    **Defendants.**    )

## AMENDED ORDER

The Leibovitch family ("Plaintiffs"), a foreign national family that includes a child citizen of the United States, Shira Leibovitch, won a substantial award pursuant to the terrorism exception of the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1605A, for various injuries sustained by Shira in a terrorist attack in Israel. *Shlomo Leibovitch, et al. v. The Syrian Arab Republic, et al.*, 2011 WL 444762 (N.D. Ill. Feb. 1, 2011) ("*Leibovitch I*"). The Leibovitch family's claims for the intentional infliction of emotional distress arising from Shira's injuries, however, were dismissed by Judge William T. Hart of the Northern District of Illinois on the grounds that the FSIA did not confer subject matter jurisdiction over claims by foreign citizens. *Id.*, at *2. On appeal, the Seventh Circuit held that Section 1605A of the FSIA did confer subject matter jurisdiction over claims of foreign citizens and remanded for reconsideration of the non-American plaintiffs' intentional infliction of emotional distress ("IIED") claims. *Shlomo Leibovitch, et al. v. Islamic Republic of Iran, et al.*, 697 F.3d 561 (7th Cir. 2012) ("*Leibovitch II*"). Presently before the Court is Plaintiffs' motion for entry of judgment against Defendants the Islamic Republic of Iran ("Iran") and its Ministry of Information and Security ("MOIS") ("collectively "Defendants").

## RELEVANT FACTS

The previous two opinions have thoroughly canvassed the underlying facts case in this case. The Court takes judicial notice of the findings of fact made by Judge Hart.[1] Therefore, the Court will provide background information for context and then proceed to a discussion of the facts pertinent to the IIED claims, which were omitted from the previous opinions. The Court takes these facts from the uncontroverted evidence, including declarations submitted from each plaintiff and expert reports.

### A.     Background Information

Plaintiffs filed their complaint on April 3, 2008. (R. 1, Compl.) Plaintiffs brought this action against: Iran; MOIS and Ali Yunesi of MOIS; Iranian Does 1-10; Ayotollah Ali Hoseini Khamenei, Supreme Leader of Iran; the Syrian Arab Republic; the Syrian Ministry of Defense, and its Minister of Defense Mustafa Tlass; Syrian Military Intelligence, and its commander Hassan Khalil; Assef Shawkat and Ali Douba of the Syrian Ministry of Defense; the Syrian Air Force Intelligence Directorate and its commander Ibrahim Hueiji; Syrian Does 1-10 and the Palestinian Islamic Jihad ("PIJ"). (*Id.*) Plaintiffs sought compensatory damages for wrongful death, battery, assault, intentional infliction of emotional distress, negligent infliction of emotional distress, civil conspiracy, aiding and abetting and vicarious liability. (*Id.*) Plaintiffs

---

[1]  The Seventh Circuit permits courts to take judicial notice of findings of fact taken from prior proceedings in a case as long as the findings of fact are "not subject to reasonable dispute." *Gen. Elec. Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1082 (7th Cir. 1997) (quoting Fed. R. Evid. 201(b)). In addition, FSIA "permits courts in subsequent related cases to rely upon the evidence presented in earlier litigation . . . without necessitating the formality of having that evidence reproduced." *Goldberg-Botvin v. Islamic Republic of Iran*, 938 F. Supp. 2d 1, 5 n.1 (D.D.C. 2013) (quoting *Anderson v. Islamic Republic of Iran*, 753 F. Supp. 2d 68, 74 (D.D.C. 2010)). Here, Defendants have failed to appear or otherwise plead. Therefore, the Court finds that Judge Hart's findings of fact are not subject to reasonable dispute, and takes judicial notice of those findings.

sought compensatory damages in the amount of $182 million and punitive damages in the amount of $300 million. (R. 64, Pls.' Final Proposed Findings of Fact & Conclusions of Law at 47-89.) Through diplomatic channels, Plaintiffs effectuated service on Iran and MOIS. (R. 26, Summons.) On March 16, 2009, Plaintiffs voluntarily dismissed without prejudice all the Syrian defendants. (R. 30, Pls.' Notice of Voluntary Dismissal.) On April 23, 2009, Judge Hart dismissed without prejudice defendants Ayatollah Ali Hoseini Khamenei, Ali Yunesi, Iranian Does 1-10 and the PIJ for failure to serve pursuant to Federal Rule of Civil Procedure 4(m). (R. 32, Min. Entry.) On that date, Judge Hart also entered a default against Iran and MOIS for failure to appear. (*Id.*) On March 15, 2010, Plaintiffs' submitted their Final Proposed Findings of Fact and Conclusions of Law. (R. 64, Pls.' Final Proposed Findings of Fact & Conclusions of Law

On February 1, 2011, Judge Hart dismissed all named defendants other than Iran and the MOIS without prejudice, (R. 72, Min. Entry), and issued his ruling in *Leibovitch I*, (R. 73, Opinion, Findings of Fact & Conclusions of Law). As described above briefly, Judge Hart ruled that Shira was injured in "an act of . . . extrajudicial killing" under the FSIA exception for terrorism, 28 U.S.C. § 1605A(a)(1) and that Iran and MOIS were vicariously liable for the PIJ's attack on the Leibovitch family because it openly provided material support and resources to the PIJ. *Leibovitch I*, 2011 WL 444762. Judge Hart awarded Shira $17.5 million in compensatory damages and an additional $35 million in punitive damages. *Id.*, at *11. He dismissed, however, all of the non-American Plaintiffs' claims for lack of subject matter jurisdiction. *Id.*, at *2. After filing an unsuccessful motion for reconsideration, (R. 75, Mot. for Recons.), Plaintiffs appealed to the Seventh Circuit. On October 17, 2012, the Seventh Circuit issued its opinion in *Leibovitch II*, holding that the District Court did have subject matter jurisdiction over Plaintiffs' IIED claims

3

because plaintiffs that are foreign national family members of victims of terrorist attacks may

bring suit under the FSIA. 697 F.3d at 572. The court held that Shira was a "victim" pursuant

to the FSIA, and therefore her foreign national family members may bring suit. *Id*. The court

remanded for further proceedings, however, for the District Court to determine whether Plaintiffs

had viable IIED claims. *Id*. at 573. The court noted that while Plaintiffs had jurisdiction to bring

their claims under 28 U.S.C. § 1605A(c), Congress did not provide a federal cause of action, and

thus the District Court was to determine the viability of Plaintiffs' IIED claims under Israeli law,

as Israel was the site of the attack. *Id*. n.6.

On October 25, 2012, this case was reassigned to this Court for all further proceedings.

Plaintiffs filed their motion for a default judgment on April 3, 2013. The Court proceeds to its

discussion of the facts pertinent to Plaintiffs' IIED claims.

### B.      Shlomo Leibovitch

Shlomo Leibovitch is an Israeli citizen who resides in Yemin Orde, Israel. (R. 47,

Shlomo Leibovitch Decl. ¶ 1.) On June 17, 2003, Shlomo, along with his wife, Galit; her mother

and father, Shmuel and Miriam Elia; his son, Moshe; and his three daughters Noam, Shira, and

Hila, traveled in the family's minivan returning home from his nephew's bar mitzvah celebration

in Jerusalem. (*Id*. ¶ 4.) As the Leibovitch family approached Kalkilya, Shlomo heard the sound

of gun blasts from the side of the road and felt the car being hit by bullets. (*Id*. ¶ 5.) Shlomo

drove away as fast as possible while his wife called the police for help. (*Id*. ¶ 6.) He saw Noam

lying completely motionless, and Shira was covered in blood and "screaming in agony." (*Id*. ¶¶

6-8.) Shlomo and Galit began to perform cardiac and pulmonary resuscitation on Noam. (*Id*. ¶

9.) Nearly twenty minutes later, an army physician and medic arrived at the scene. (*Id*. ¶ 12.)

The army physician took over Shlomo's efforts to resuscitate Noam, but eventually he stopped, telling Shlomo "there was nothing else anyone could do." (*Id.*)

Ambulances transported Shira to Bellinson Hospital in Petah Tikva, where physicians told Shlomo that one bullet was lodged near Shira's spinal column and another had damaged her right hand. (*Id.* ¶¶ 15-16.) The night of the attack, Shlomo could not sleep because he felt "helpless, anguished and restless." (*Id.* ¶ 20.) Following the funeral for 7-year old Noam Leibovitch, who was killed in the attack, the Leibovitch family endured an "emotionally tolling experience" assisting Shira with her recovery. (*Id.* ¶ 23.) Shlomo was employed as a deputy general manager at a local youth village, but eventually had to quit his job as a result of the mounting stress his family experienced. (*Id.* ¶ 27.) He became a teacher because it required less responsibility and time, but he now earns a much lower salary than he did in his previous position. (*Id.*) Mundane activities, such as going to the mall, create great anxiety for Shlomo. (*Id.* ¶ 28.) He relives the attack "dozens of times each day." (*Id.* ¶ 29.) Shlomo experiences the pain of Shira's injury and Noam's death daily, describing it as an "open wound that bleeds and continues to hurt without rest." (*Id.* ¶ 33.)

Plaintiffs presented the expert report of Dr. Rael Strous, a licensed psychiatrist who performed a clinical interview and psychiatric evaluation on Shlomo, as well as the other plaintiffs in this case. (R. 45-2, Ex. B, Strous Report of Shlomo Leibovitch.) Dr. Strous diagnosed Shlomo with moderate Post Traumatic Stress Disorder (PTSD). (*Id.* at 5.) Dr. Strous found that the diagnosis of chronic PTSD was evidenced by the presence of flashbacks, avoidance, and heightened emotional reactivity. (*Id.*) He observed that while some of the symptoms of emotional pain have improved since the attack, many have not, and that Shlomo's life "has become irreversibly changed." (*Id.*) He also observed that in addition to personal and

family changes, Shlomo's occupational ambition has been affected.  (*Id.*)  Dr. Strous concluded that "based on these persistent features of chronic PTSD . . . [Shlomo] will continue in the future to suffer chronic symptomatology in the aftermath of the shooting despite considerable time having elapsed since the event."  (*Id.*)

C.    **Galit Leibovitch**

Galit Leibovitch is an Israeli citizen who resides in Yemin Orde, Israel.  (R. 48, Galit Leibovitch Decl. ¶ 1.)  After the attack, Galit spent her time at Shira's bedside.  (*Id.* ¶¶ 13-18, 40.)  She left to attend Noam's funeral and returned to Shira's bedside immediately thereafter. (*Id.* ¶ 19.)  Galit spent the year following the attack focused on Shira's recovery.  (*Id.* ¶ 21.)  She transported Shira 55 miles each way three times a week to and from the Tel Hashomer Medical Center for physical therapy sessions that were "very difficult to watch."  (*Id.*)  Aside from her focus on Shira's physical therapy, Galit "hardly functioned at all" and was unable to perform basic housekeeping requirements such as cooking, shopping, and cleaning.  (*Id.* ¶ 31.)  She required outside assistance with household cleaning.  (*Id.*)

After two years, Galit attempted to return to her career as a teacher, which she had given up prior to the attack, but was unable to teach a full class.  (*Id.* ¶ 33.)  Instead, she assumed the less arduous role of a tutor.  (*Id.*)  Currently, Galit is able to work nearly full-time as a teacher but she cannot teach classes in which students have disciplinary issues or work overtime due to the overwhelming stress it causes.  (*Id.* ¶ 35.)  She turned down a promotion at work because she has no ambition or desire to excel professionally.  (*Id.* ¶ 36.)  Galit observes that she is "constantly exhausted, afraid, angry, and stressed" and has "almost no joy in [her] life in general."  (*Id.* ¶¶ 35-36.)  She no longer feels safe outside of her home and has difficulty adapting to changes in her routine.  (*Id.* ¶¶ 37.)  During holidays and special events, Galit suffers

from severe stomachaches, vomiting, and diarrhea. (*Id.* ¶ 39.) The attack and Shira's resulting disability have also placed a strain on Galit and Shlomo's marriage and on her other family relationships, forcing her to seek treatment in a psychiatric hospital. (*Id.* ¶ 38, 41.) She was prescribed anti-depressants and continues to see a therapist each week. (*Id.* ¶ 41.)

Dr. Strous found that Galit suffers from moderate-to-severe PTSD. (R. 45-3, Ex. C, Strous Report of Galit Leibovitch at 4.) He observed that she exhibited avoidance and heightened emotional reactivity. (*Id.* at 5.) He also noted that reports from her treating psychologists indicated a decline in cognitive function, and that she previously suffered from depression and anxiety. (*Id.* at 2, 4.) Dr. Strous concluded that Galit will continue to suffer chronic symptomatology. (*Id.* at 5.)

**D.     Moshe Leibovitch**

Moshe Leibovtich is an Israeli citizen who resides in Yemin Orde, Israel. (R. 49, Moshe Leibovitch Decl. ¶ 1.) He was eleven years old at the time of the attack. (*Id.* ¶ 3.) Moshe was seated next to his sisters Shira and Noam in the minivan during the attack, and he attempted to shield them from the gunfire. (*Id.*) He sustained injuries from glass shattered by bullets. (*Id.* ¶ 4.) After the attack, Moshe experienced intense anxiety, nightmares, fear of the dark, and fear of being alone. (*Id.* ¶ 7.) He developed psoriasis as a result of stress and anxiety. (*Id.*) He describes the months and years following the attack as a "dark time . . . filled with depression and suffering." (*Id.* ¶ 9.) Moshe withdrew from friends and had difficulty concentrating in school. (*Id.*) He began therapy shortly after the attack, and has used art and equine therapy to increase his self-confidence. (*Id.* ¶ 10.) Dr. Strous diagnosed him with mild PTSD and chronic

dysthymia.[2]  (R. 45-7, Ex. G, Strous Report of Moshe Leibovitch at 3-4.)  Dr. Strous based his diagnosis in part on Moshe's insomnia, nightmares, anxiety, and chronic low mood.  (*Id.* at 4.)  Dr. Strous expects Moshe, like his parents, will continue to suffer chronic symptomatology.  (*Id*.)

### E.     Hila Leibovitch

Hila Leibovtich is an Israeli citizen who resides in Yemin Orde, Israel.  (R. 50, Hila Leibovitch Decl. ¶ 1.)  She was sixteen years old at the time of the attack.  (*Id.* ¶ 3.)  Hila sat a row in front of Shira and Noam in the minivan during the attack, and assisted her parents in tending to Shira's injuries.  (*Id.* ¶¶ 3, 6.)  Hila experienced difficulty sleeping, fatigue, depression, and emotional sensitivity in the year following the attack, and she has sought therapy to deal with her symptoms.  (*Id.* ¶¶ 18, 21, 23.)  She "live[s] with the pain of the terrorist shooting everyday."  (*Id.* ¶ 28.)  Dr. Strous diagnosed Hila with mild PTSD and chronic dysthymia and opined that she will continue to suffer some chronic symptomatology from the attack.  (R. 45-8, Ex. H, Strous Report of Hila Leibovitch at 3.)

### F.     Shmuel Eliad

Shmuel Eliad is an Israeli citizen and a resident of Netanya, Israel.  (R. 51, Shmuel Eliad Decl. ¶ 1.)  He was seated in a rear passenger seat in the minivan when the attack occurred.  (*Id.* ¶ 4.)  Shmuel attempted to assist in administering first aid to Shira and Noam, but he was too overcome with distress and shock.  (*Id.* ¶¶ 5-6.)  He relives the attack daily in vivid detail accompanied by feelings of anguish and guilt.  (*Id.* ¶¶ 10-12.)  Shmuel experiences frequent bouts of severe depression and anxiety, and he rarely leaves his home.  (*Id.* ¶ 15.)  He attends therapy regularly and takes psychiatric medication, which has not led to significant relief.  (*Id.*)

---

[2]  Dysthymia is a mild, but long-term form of depression.  *Dysthymia*, Mayo Clinic, *available at* http://www.mayoclinic.org/diseases-conditions/dysthymia/basics/definition/con-20033879 (last visited Mar. 26, 2014).

Dr. Strous diagnosed Shmuel with chronic depression and moderate-to-severe PTSD, as evidenced by sleep impairment, flashbacks, avoidance behavior, anxiety and chronic low mood. (R. 45-4, Ex. D, Strous Report of Shmuel Eliad at 3.)  His prognosis was that Shmuel will continue to suffer some chronic symptomatology from the attack.  (*Id*. at 3-4.)

G.    **Miriam Eliad**

Miriam Eliad is a resident of Israel.  (R. 52, Miriam Eliad Decl. ¶ 1.)  Miriam was sitting in a rear passenger seat during the attack.  (*Id*. ¶ 2.)  When the gunfire subsided, Miriam saw Shira and Noam covered in blood and became hysterical.  (*Id*. ¶ 7.)  When ambulances arrived to transport Shira and Noam to the hospital, Miriam had to be transported separately and given an oxygen breathing tube.  (*Id*. ¶ 8.)  Since the attack, she experiences flashbacks, insomnia, and paranoia, and has suffered hearing loss in her left ear.  (*Id*. ¶¶ 12-13.)  Miriam sought therapy for chronic sleep problems and ongoing depression at a psychiatric clinic, where she was also prescribed antidepressants.  (*Id*. ¶ 18.)  Dr. Strous diagnosed Miriam with moderate-to-severe PTSD, evidenced by sleep impairment, nightmares, flashbacks, avoidance behavior, anxiety, and chronic depression.  (R. 45-5, Ex. E, Strous Report of Miriam Eliad at 3.)  Dr. Strous observed that "[Miriam] remains particularly preoccupied with the injuries to her granddaughter . . . which have become the ongoing focus of her concerns." (*Id*. at 3.)  He opined that Miriam, like the rest of her family, will continue to suffer some chronic symptomatology from the attack.  (*Id*. at 4.)

H.    **Nerya Leibovitch**

Nerya was born to Shlomo and Galit Leibovitch eleven months after the attack.  (R. 64, Pls.' Final Proposed Findings of Fact & Conclusions of Law at 69.)  From her birth, Nerya's family was preoccupied and overwhelmed with Shira's treatment, and their own psychological

9

and emotional needs.  (*Id.*)  As a result of the attack, she has been deprived of a normal

childhood and family life.  (*Id.*)

## LEGAL STANDARD

A court shall not enter a default judgment against a foreign state "unless the claimant

establishes his claim or right to relief by evidence satisfactory to the court."  28 U.S.C. §

1608(e).  This "satisfactory to the court" standard is identical to the standard for entry of default

judgments against the United States in Federal Rule of Civil Procedure 55(d).  *Moore v. United*

*Kingdom*, 384 F.3d 1079, 1090 (9th Cir. 2004); *Hill v. Republic of Iran*, 328 F.3d 680, 683 (D.C.

Cir. 2003).  Plaintiffs may present such evidence in the form of affidavits or declarations rather

than through live witnesses testifying in open court.  *Anderson*, 753 F. Supp. 2d at 74; *Estate of*

*Botvin ex rel. Ellis v. Islamic Republic of Iran*, 604 F. Supp. 2d 22, 26 (D.D.C. 2009) ("*Botvin*

*I*"); *Wachsman ex rel. Wachsman  v. Islamic Republic of Iran*, 603 F. Supp. 2d 148, 155, 162

(D.D.C. 2009).  Upon evaluation, the Court may accept any uncontroverted evidence presented

by plaintiffs as true.  *Estate of Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d 229, 255

(D.D.C. 2006) ("*Heiser I*") (citing *Campuzano v. Islamic Republic of Iran*, 281 F. Supp. 2d 258,

268 (D.D.C. 2003)).  Finally, a FSIA court "may take judicial notice of related proceedings and

records in cases before the same court."  *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52,

59 (D.D.C. 2010) (quoting *Brewer v. Islamic Republic of Iran*, 664 F. Supp. 2d 43, 50-51

(D.D.C. 2009)).  This Court accepts as true the uncontested evidence and testimony submitted by

Plaintiffs.  Not only have the Defendants not objected to such evidence or even appeared in court

to contest it, but the Court finds the evidence submitted by Plaintiffs to be relevant to and highly

probative of their claims.

## ANALYSIS

## I.      Jurisdiction

The FSIA provides immunity from suit to foreign states and denies United States courts jurisdiction over suits against foreign states.  28 U.S.C. § 1604.  The state-sponsored terrorism exception to the FSIA eliminates immunity and grants federal courts original jurisdiction over suits against a foreign state if (1) money damages are sought (2) against a foreign state (3) for personal injury or death (4) that was caused (5) "by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act . . . ." 28 U.S.C. § 1605A(a)(1).  *Leibovitch I* and *Leibovitch II* previously established that jurisdiction exists over Plaintiffs' claims and that Iran's immunity has been waived.  *Leibovitch I*, 2011 WL 444762 at, * 9; *Leibovitch II*, 697 F.3d at 562.  This Court adopts the jurisdictional analyses from those cases.

## II.     Governing Law

As the Seventh Circuit made clear in *Leibovitch II*, "neither 28 U.S.C. § 1605(a)(7) nor the Flatow Amendment, nor the two considered in tandem, creates a private right of action against a foreign government."  *Leibovitch II*, 697 F.3d at 566 (quoting *Cicippio–Puleo v. Islamic Republic of Iran*, 353 F.3d 1024, 1033 (D.C. Cir. 2004)).  Because Congress did not provide Plaintiffs a private right of action in the FSIA, Plaintiffs must establish a separate legal basis for their cause of action.  *Id.* at 564 (citing *First Natl. City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611, 621-23 (1983)).

The previous decisions in *Leibovitch I* and *Leibovitch II* held that Israeli law applies in this case.  The law of the case doctrine mandates that this Court leave that ruling undisturbed, absent a compelling reason.  *Minch v. City of Chi.*, 486 F.3d 294, 301 (7th Cir. 2007).  Plaintiffs

have provided no reason why Israeli law should not apply to their claims. Therefore, this Court will use Israeli law to evaluate Plaintiffs' claims.

Federal Rule of Civil Procedure 44.1 provides that when determining the law of a foreign jurisdiction, a court may "consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence." Fed. R. Civ. P. 44.1; *see also Pittway Corp v. United States*, 88 F.3d 501, 504 (7th Cir. 1996) (noting that the Advisory Committee Notes to Rule 44.1 "spell out the court's prerogative to engage in its own research and consider any relevant material thus found"). Oral or written expert testimony accompanied by foreign legal materials is commonly provided to help courts apply foreign law. *United States. v. Pre-Columbian Artifacts*, 845 F. Supp. 544, 546 (N.D. Ill. 1993). The Seventh Circuit urges trial courts to research and analyze foreign law independently of expert testimony. *Twohy v. First Natl. Bank of Chicago*, 758 F.2d 1185, 1193 (7th Cir. 1985). Accordingly, this Court has performed independent research, unaided by the conclusory and deficient briefing on this issue provided by Plaintiffs and its expert, in order to evaluate whether Plaintiffs' IIED claims would prevail under Israeli law.

If the parties do not offer an "adequate statement of the law," however, the Court is not required to remedy the deficiency. *Minebea Co., Ltd. v. Papst*, 444 F. Supp. 2d 68, 185 (D.D.C. 2006), *see also Twohy*, 758 F.2d at 1193 (noting that "[n]othing in Rule 44.1 strictly requires a district judge to engage in private research."). Where parties have not provided an adequate statement of the law, "the forum will usually decide the case in accordance with its own local law except when to do so would not meet the needs of the case or would not be in the interests of justice." *Estate of Botvin ex rel. Ellis v. Islamic Republic of Iran*, 772 F. Supp. 2d 218, 228 (D.D.C. 2011)("*Botvin II*") (quoting Restatement (Second) of Conflict of Laws § 136 cmt. h

12

(1971)); *see also Minebea*, 444 F. Supp. 2d at 185 ("[W]hen both parties have failed to prove foreign law, the forum may say that the parties have acquiesced in the application of the local law of the forum." (quoting *Oparaugo v. Watts*, 884 A.2d 63, 71 (D.C. 2005))).

## V.      Plaintiffs' IIED Claims[3]

### A.      Living Plaintiffs

Plaintiffs argue that their IIED claims are recognized under Israeli law, (R. 101, Pls.' Mot. for J. at 8), and support this contention with an affidavit by Israeli legal expert Avraham Colthof, (R. 58, Colthof Aff.). Colthof failed, however, to provide any relevant case law to support this contention. Pursuant to Seventh Circuit precedent, the Court conducted its own independent analysis of Israeli case law.

Under Israeli law, "a defendant owes a duty of care in tort toward someone who is injured mentally, not to inflict such an injury on him, where the mental injury was the probable, foreseeable consequence of the defendant's conduct." LCA 444/87 *Munhar Alsoucha v. Dehan*, at 56 [1990] (Isr.). The relevant inquiry is "whether a reasonable person should have foreseen the occurrence of the injury." *Id*. at 58. The *Dehan* court was concerned, however, that exclusive reliance on the foreseeability test would lead to a "multiplication of claims, including, in all probability, claims on account of trivial damage, and baseless and false claims." *Id*. at 62. Therefore, based upon considerations from American and other foreign tort law, the court identified four factors to consider in evaluating whether claims for mental injury are meritorious:

---

[3]   After conceding before Judge Hart that the court has no jurisdiction over Plaintiffs' claims for battery, assault, negligent infliction of emotional distress, civil conspiracy, aiding and abetting, and vicarious liability, (R. 75, Pls.' Mot. for Recons. at 3-4), Plaintiffs attempt to re-assert these claims in their briefs before this Court, (R. 101, Pls.' Mot. for J. at 7). The Seventh Circuit held that this Court retains subject matter jurisdiction only over Plaintiffs' IIED claims and remanded only that claim to this Court. *Leibovitch II*, 697 F.3d at 563. Thus, the Court disregards Plaintiffs' re-assertion of all their claims and limits its analysis to their IIED claims, as directed by the Seventh Circuit.

(1) whether plaintiffs enjoy a close relationship to the primary victim; (2) whether plaintiffs directly perceived the tortious act; (3) plaintiff's degree of spatial and temporal proximity to the injurious event; and (4) the severity mental injury. *Id*. at 62-73.

Here, the Court finds that Plaintiffs' mental injuries are the probable, foreseeable consequence of the PIJ's attack on the Leibovitch family, as a reasonable person would expect that enduring such a heinous attack would result in mental injury. Next, the Court must determine whether Plaintiffs' claims meet the *Dehan* court's four-factor test. As to the first element, the closeness of the relationships, the *Dehan* court held that first-degree relatives, defined as parents, spouses, and children, automatically meet this criterion. *Id*. at 63. The court left open the question of whether other relationships would meet this requirement. Shlomo and Galit Leibovitch, Shira's parents, meet this test. Plaintiffs' expert attests that Israeli law recognizes Shira's siblings and grandparents IIED claims.[4] (R. 58, Aff. Avraham Colthof ¶ 26.) Dehan was decided by the Israeli Supreme Court over twenty years ago. The Court was not able to locate any Israeli case law in the intervening years where the court held that IIED claims are limited to first-degree relatives. Accordingly, the Court relies on Plaintiffs' expert on this point. Thus, the Court finds that all Plaintiffs meet the "close relationship" requirement.

---

[4] In Plaintiffs' legal expert's affidavit, he attests that Nerya Leibovitch, Shira's sibling who was born after the attack, would also prevail on an IIED claim if she could demonstrate psychological trauma as a result of the shooting and resulting injuries Shira sustained. (R. 58, Colthof Aff. ¶ 26.) Plaintiffs have provided neither an affidavit from Nerya herself nor a psychiatric evaluation from Dr. Strous detailing Nerya's condition. In the absence of any supporting documentation, the Court cannot hold that an unborn child sustained emotional distress from an accident she did not experience. Aside from calculating damages for Nerya, Plaintiffs do not actually argue that Nerya suffered from an IIED. "[I]t is not this court's responsibility to research and construct the parties' arguments, and conclusory analysis will be construed as waiver." *Gross v. Town of Cicero, Ill.*, 619 F.3d 697, 704 (7th Cir. 2010) (quoting *APS Sports Collectibles, Inc. v. Sports Time, Inc*., 299 F.3d 624, 631 (7th Cir. 2002); *see also Palmer v. Marion Cnty.*, 327 F.3d 588, 597-98 (7th Cir. 2003) (deeming the plaintiff's negligence claim abandoned because he failed to delineate it in his brief in opposition to summary judgment). Accordingly, the Court finds that Plaintiffs have waived Nerya's IIED claim.

14

As to the second element, whether the plaintiff directly perceived the tort, the *Dehan* court held that witnessing a tortious act is not determinative, but the foreseeability of mental injury increases when one witnesses the act. Here, Plaintiffs were present in the vehicle and experienced the horrific attack along with Shira. Consequently, the Court finds that Plaintiffs directly perceived the act and thus satisfy the second element.

The third element, spatial and temporal proximity to the injurious event, is implicated when the mental injury is "the product of a continuous process of exposure to the consequences of the injurious event" as opposed to mental injury resulting from a one-time experience. LCA 444/87 *Munhar Alsoucha*, at 46. The *Dehan* court ultimately concluded that "the distinction between mental injury caused on the spot . . . and damage caused at a later stage" is arbitrary, and the distinction should be based upon the extent of the damage, or "clear proof of real and definite mental injury." *Id*. at 69. In this case, the Plaintiffs have all sought therapy and been diagnosed with PTSD and depression. In addition, Galit and Miriam have been prescribed antidepressants, and Galit has been hospitalized and experienced a decline in cognitive function. The Court finds that the deterioration of Plaintiffs' mental health constitutes "clear proof" of injury such that Plaintiffs meet the proximity factor.

The fourth element, the severity of mental injury, is materially similar to the third element and requires substantial recognized mental illness, mental injury with physiological manifestations, or severe mental injury. The *Dehan* court cautions against compensating for slight mental harms that are "temporary and ephemeral" and therefore "an everyday matter in the reality of our lives." *Id*. at 69. Here, each Plaintiff exhibits mental injury with physiological manifestations. In addition, Dr. Strous opined that the Leibovitch family has endured mental

traumas for several years and will continue to experience their traumas for the foreseeable future. Therefore, the Court finds that Plaintiffs meet the severe mental injury factor.

The Court finds support for its conclusions in the test formulated by federal courts that have previously analyzed IIED claims under Israeli law:

> [E]motional harm is generally not compensable under Israeli law unless the plaintiff has established a reasonable causal proximity in both time and place, between the event and the emotional harm, and plaintiff either personally experiences the tragic event, or in an exceptional case, learns about the event in such circumstances that the emotional damage is expectable.

*Estate of Botvin v. Islamic Republic of Iran*, 873 F. Supp. 2d 232, 245 (D.D.C. 2012) ("*Botvin III*") (quoting *Goldberg v. UBS AG*, 660 F. Supp. 2d 410, 423 (E.D.N.Y. 2009)). Plaintiffs' presence in the minivan during the attack establishes causal proximity in both time and place between the event and the emotional harm. Plaintiffs experienced the tragic event that gave rise to their IIED claims firsthand. Therefore, the Court finds that Plaintiffs' IIED claims are recognized under Israeli law.

As a final matter, the Court addresses whether Defendants Iran and MOIS are vicariously liable for the actions of the PIJ. The Court pauses to note that PIJ members Samach Shubaki and Tarek Hassain confessed to committing the attack to Israeli law enforcement authorities. 2011 WL 444762, at *5. However, Plaintiffs subsequently dismissed the PIJ from this action due to failure to serve pursuant to Federal Rule of Civil Procedure 4(m), and thus the PIJ's liability is not at issue in this case. In *Leibovitch I*, the Court determined Iran and MOIS were vicariously liable for Shira's injuries, but the Court must determine Iran and MOIS' liability for the non-American Plaintiffs' IIED claims. Having analyzed the merits of the IIED claims under Israeli law, the Court proceeds to analyze vicarious liability under Israeli law as well to ensure that Iran and MOIS are liable "in the same manner and to the same extent" as it would be if Plaintiffs

brought their claims in Israel. 28 U.S.C. § 1606. Section 14 of the Civil Wrongs Ordinance ("CWO") codifies the requirements for vicarious liability. (R. 58, Colthof Aff. ¶ 16.) It provides that "[a]ny person who employs an agent . . . to do any act or class of acts on his behalf shall be liable for anything done by such agent in the performance of, and for the manner in which such agent does such act or class of acts." CWO (New Version), 5728–1968, 2 LSI 5, § 14 (1972) (Isr.). The Court has already taken judicial notice of the *Leibovitch I* court's findings of fact, including that Iran and MOIS provided material support and resources to the PIJ for the specific purpose of carrying out terrorist acts. 2011 WL 444762, at *9. In addition, Iran was designated as a state sponsor of terrorism by the United States at the time Iran provided the PIJ with material support and resources and at the time of the attack. *Id.* Therefore, the Court finds that the PIJ was an agent of Iran and MOIS, and consequently, Iran and MOIS are vicariously liable for any torts the PIJ committed.

## B. Estate of Noam Leibovitch

Plaintiffs assert that the estate of Noam Leibovitch, with her parents serving as named representatives, is entitled to compensatory damages. (R. 101, Pls.' Mot. for J. at 12.) The Court assumes that Plaintiffs are therefore asserting an IIED claim on behalf of Noam's estate. Plaintiffs offer no legal basis for the estate's claim under either Israeli or American law. After conducting its own independent research, the Court is unable to say whether Israeli law recognizes such a claim. Having been denied an adequate statement of Israeli law, the Court finds that Plaintiffs have "acquiesced in the application of the local law of the forum." *Minebea*, 444 F. Supp. 2d at 185. Rather than denying the estate's claim, the Court finds applying the forum law an especially appropriate alternative because "the United States has a unique interest in having its domestic law apply in cases involving terrorist attacks on United States citizens."

17

*Greenbaum v. Islamic Republic of Iran*, 451 F. Supp. 2d 90, 102 (D.D.C. 2006) (applying U.S. law rather than foreign law to tort claims in a FSIA suit due to the United States' "unique interest" in having its law apply); *see Wachsman ex rel. Wachsman v. Islamic Republic of Iran*, 537 F. Supp. 2d 85, 96-97 (D.D.C. 2008) (the court applied Israeli law to wrongful death claim, and District of Columbia law to plaintiff's IIED claim where Israeli law would not allow him to bring a claim recognizing the "paramount interest in guaranteeing redress to U.S. citizens"). Accordingly, the Court will evaluate the estate's claim under Illinois law.

To establish a claim of IIED under Illinois law, a plaintiff must prove that: "(1) the defendants' conduct was extreme and outrageous; (2) the defendants knew that there was a high probability that their conduct would cause severe emotional distress; and (3) the conduct in fact caused severe emotional distress." *Swearnigen-El v. Cook Cnty Sheriff's Dep't*, 602 F.3d 852, 864 (7th Cir. 2010) (citing *Kolegas v. Heftel Broad. Corp.*, 607 N.E.2d 201, 211 (Ill. 1992)). "To meet the 'extreme and outrageous' standard, the defendants' conduct 'must be so extreme as to go beyond all possible bounds of decency, and to be regarded as intolerable in a civilized community.' " *Id.* (quoting *Kolegas*, 607 N.E.2d at 211); *see also Fox v. Hayes*, 600 F.3d 819, 842 (7th Cir. 2010).

Here, although there is a dearth of Illinois case law regarding IIED claims in FSIA suits, the Court finds that Defendant's conduct was extreme and outrageous. Defendants' conduct, which includes supporting a terrorist organization in its efforts to kill innocent civilians, goes beyond all bounds of decency and easily meets the "extreme and outrageous" standard. A district court with particular competence in adjudicating FSIA claims, the United States District Court for the District of Columbia, held that "[a]cts of terrorism are by their very definition extreme and outrageous and intended to cause the highest degree of emotional distress." *Belkin*

18

*v. Islamic Republic of Iran*, 667 F. Supp. 2d 8, 22 (D.D.C. 2009) (citing *Stethem v. Islamic Republic of Iran*, 201 F. Supp. 2d 78, 89 (D.D.C. 2002)).  In addition, in *Salazar v. Islamic Republic of Iran*, the court, applying Illinois law to an IIED claim, found that a terrorist attack constituted extreme and outrageous conduct.  370 F. Supp. 2d 105, 115 (D.D.C. 2005).  Therefore, the Court is confident that Defendants' conduct here meets the "extreme and outrageous" standard.

As to the second element of an IIED claim under Illinois law, conduct intended to cause severe emotional distress, the Illinois Supreme Court has held that "[l]iability extends to situations in which there is a high degree of probability that severe emotional distress will follow and the actor goes ahead in conscious disregard of it."  *Pub. Fin. Corp. v. Davis*, 360 N.E.2d 765, 767 (Ill. 1976).  The Seventh Circuit held that "[Illinois courts] have generally found this element to be satisfied . . . when a defendant's actions, by their very nature, were likely to cause severe distress."  *Honaker v. Smith*, 256 F.3d 477, 494 (7th Cir. 2001).  The Court finds that the very nature of Defendants' actions were intended to cause severe emotional distress to the victims of the PIJ's attacks.  *See Belkin*, 667 F. Supp. 2d at 22.

Under the last IIED element, severe emotional distress, "in many cases the extreme and outrageous character of the defendant's conduct is in itself important evidence that the distress has existed."  *Honaker*, 256 F.3d at 496 (citations omitted).  "These cases have acknowledged that, even when significant evidence was not presented as to the severity of distress, the very nature of the conduct involved may be evidence of its impact on the victim."  *Id*.  As a result, Illinois courts "tend to merge the issue of the outrageousness of the defendant's conduct with the issue of the severity of the plaintiff's emotional distress, in effect requiring more evidence of outrageousness the weaker the evidence of distress."  *Id*. (quoting *Bristow v. Drake St*., Inc., 41

F.3d 345, 350 (7th Cir. 1994)).   Here, although Noam cannot provide testimony as to her emotional distress, the Court finds that the extreme and outrageous nature of Defendants' conduct tips the scale in favor of permitting the estate to prevail.  The Court acknowledges that this is not a clear cut issue, but finds that severe emotional distress is present in this case by virtue of the Defendants' highly outrageous conduct.

Accordingly, the Court finds that Noam's estate succeeded in proving her IIED claim.

## VI.   Compensatory Damages[5]

Having established that Plaintiffs' IIED claims are recognized under Israeli law, the Court now proceeds to determine the appropriate amount of damages to be awarded to each Plaintiff.  To obtain damages against defendants under the FSIA, the plaintiffs must prove that the consequences of the Defendants' conduct were "reasonably certain (i.e., more likely than not) to occur, and must prove the amount of damages by a reasonable estimate consistent with this [court's] application of the American rule on damages." *Salazar v. Islamic Republic of Iran,* 370 F. Supp. 2d 105, 115-16 (D.D.C. 2005) (quoting *Hill,* 328 F.3d at 681 (internal quotations omitted)).  Here, it was reasonably certain that Noam's death and Shira's serious injury would occur given Defendants heinous actions. Although the damages calculations Plaintiffs proffer are somewhat inflated, the Court finds them to be a reasonable estimate based upon previous FSIA cases.

---

[5]   Though Plaintiffs' complaint and pleadings seek punitive damages, a claim directly under 28 U.S.C.§ 1605A(a)(2) does not permit punitive damages as against Iran or MOIS.  28 U.S.C. § 1606; *In re Islamic Republic of Iran Terrorism Litig*., 659 F. Supp. 2d 31, 48 n.10 (D.D.C. 2009); *Levin v. Islamic Republic of Iran*, 529 F. Supp. 2d 1, 20 (D.D.C. 2007).  In *Leibovitch II*, the Seventh Circuit specifically held that Plaintiffs "cannot make use of the private right of action" in § 1605A(c), which does provide for punitive damages in light of the Flatow Amendment.  697 F.3d at 569.

In addition, "[t]o recover damages, a FSIA default winner must prove damages in the same manner and to the same extent as any other default winner." *Wachsman*, 603 F. Supp. 2d at 160 (quoting *Hill,* 328 F.3d at 684-85) (internal quotation marks omitted); *see* 28 U.S.C. § 1606 (stating that a "foreign state shall be liable in the same manner and to the same extent as a private individual under like circumstances"). Thus, the Court must award damages according to Israeli law. The Court, however, has been placed at a severe disadvantage in this task by Plaintiffs' deficient briefing on this topic. Plaintiffs and their legal expert have failed to provide the Court with relevant material pertaining to damages awards for mental injury under Israeli law. Another district court evaluating a damages award for an IIED claim under Israeli law noted that "such awards in Israel are typically lower than those in the United States." *Goldberg*, 660 F. Supp. 2d at 423. With such little relevant information to chart its course upon, the Court finds it necessary to employ the law of the forum in assessing the proper damages award. Conducting further research would unduly burden both Plaintiffs and the Court. Thus, the Court concludes that "in the interests of justice" the Court must apply the law of the forum to the damages assessment. *Botvin*, 772 F. Supp. 2d at 228; *see also Pancotto v. Sociedade de Safaris de Mocambique, S.A.R.L.*, 422 F. Supp. 405 (N.D. Ill. 1976) (the district court applied Mozambique law to the substantive claim and Illinois law to the damages assessment where Mozambique law failed to offer adequate remedy and thus offended Illinois public policy). Unfortunately, the Court's research did not yield any relevant Illinois case law analyzing damages awards under the FSIA. Therefore, keeping in line with several other FSIA courts, the Court will, in the interests of justice, apply federal law to its damages assessment. *See Oveissi v. Islamic Republic of Iran* ("*Oveissi II*"), 768 F. Supp. 2d 16

(D.D.C. 2011) (applying French law to tort actions and federal law to damages award); *Kirschenbaum v. Islamic Republic of Iran*, 572 F. Supp. 2d 200 (D.D.C. 2008) (applying New York law to tort claims and federal law to damages award); *Blais v. Islamic Republic of Iran*, 459 F. Supp. 2d 40 (D.D.C. 2006) (applying Florida and Virginia state law to tort claims and federal law to damages award). The Court will thus rely on general federal law principles concerning damage awards in FSIA litigation, with reference to Israeli law where such information is available and may aid the Court in reaching an appropriate determination of damages

### A. General Principles For Assessing Damages in FSIA Litigation

"Under the FSIA, a solatium claim is indistinguishable from an IIED claim." *Valore*, 700 F. Supp. 2d at 85 (citing *Estate of Heiser v. Islamic Republic of Iran*, 659 F. Supp. 2d 20, 27 n.4 (D.D.C. 2009) ("*Heiser II*")). Solatium is awarded to compensate for the "the mental anguish, bereavement and grief that those with a close personal relationship to a decedent experience as the result of the decedent's death, as well as the harm caused by the loss of the decedent, society and comfort." *Belkin*, 667 F. Supp. 2d at 22 (citing *Dammarell v. Islamic Republic of Iran*, 281 F. Supp. 2d 105, 196-97 (D.D.C. 2003)). "In determining the appropriate amount of compensatory damages, the Court may look to prior [FSIA] decisions" for guidance. *Heiser I*, 466 F. Supp. 2d at 269.

As a general rule, families of victims who have died are awarded greater damages than families of victims who survived. *Rimkus v. Islamic Republic of Iran*, 575 F. Supp. 2d 181, 198 (D.D.C. 2008) (citing *Heiser I*, 466 F. Supp. 2d at 269). The nature of the relationship between the claimant and the victim is a key factor in determining the appropriate award. *Oveissi II*, 425

F. Supp. 2d at 25-26.  Another key factor in calculating damages is the "severity and duration of the pain suffered by the family member."  *Id.*

The *Heiser I* court developed a framework for the calculation of damage awards in FSIA cases in which spouses of deceased victims were awarded approximately $8 million, while parents and children received $5 million and siblings received $2.5 million.  466 F. Supp. 2d at 269.  Relatives of surviving servicemen received awards valued at half of the awards to family members of the deceased: $2.5 million for parents and $1.25 million for siblings.  *Murphy v. Islamic Republic of Iran*, 740 F. Supp. 2d 51, 79 (D.D.C. 2010).  This framework has been applied in subsequent FSIA cases.  *See, e.g.*, *Valore*, 700 F. Supp. 2d at 85-86; *Beer v. Islamic Republic of Iran*, 574 F. Supp. 2d 1, 13 (D.D.C. 2008).  This framework provides "useful guidance for FSIA courts; however, these numbers are not set in stone."  *Oveissi II*, 768 F. Supp. 2d at 26 (quoting *Murphy*, 740 F. Supp. 2d at 79) (internal alterations and quotation marks omitted).

### B.    Award of Damages

Using the damages framework set forth above as a guideline and recognizing the downward departure required by Israeli law, this Court awards each Plaintiff damages in the following amounts: Plaintiffs Shlomo and Galit Leibovitch are entitled to $2.25 million each to compensate them for their emotional distress resulting from the attack and loss of solatium as Shira's parents.  Plaintiffs Moshe and Hila Leibovitch are entitled to $1 million each to compensate them for their emotional distress resulting from the attack and loss of solatium as Shira's siblings.  In addition, the Court will also award Plaintiffs Miriam Eliad and Shmuel Eliad $1 million each to compensate them for their emotional distress resulting from the attack and loss of solatium.  The Court finds it appropriate to extend an award to the grandparents due to the

close relationship they enjoy with Shira and the significant distress each grandparent has endured. *See Oviessi II*, 768 F. Supp. 2d at 27 (grandparent qualified for solatium damages due to parent-child type of relationship with victim). Finally, the Court awards Shlomo and Galit Leibovitch, as representatives of Noam Leibovitch's estate, $6 million dollars for severity of anguish, grief and loss of solatium that resulted from her tragic death. The Court is aware that no amount of financial compensation can ease the Leibovitch family's continued suffering. The Court recognizes the award does not match Plaintiffs' request, but the Court is constrained by the downward trend imposed by Israeli case law, as well as its duty to provide an appropriate, fair damages award free of emotional entanglement.

## CONCLUSION

For the foregoing reasons, the Court will award judgment for Plaintiffs on Count VII. Because Plaintiffs have established a right to damages and because the evidence in the record supports the allegations in the complaint, a judgment consistent with these findings will be entered against Iran and MOIS in the amount of $14.5 million for solatium.

ENTERED: _____

**Chief Judge Ruben Castillo**
**United States District Court**

**Dated: March 31, 2014**

24