## UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| **SHLOMO LEIBOVITCH,** *et al.*, | ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) **No. 08 C 1939** |
| **v.** | ) |
| | ) **Chief Judge Rubén Castillo** |
| **ISLAMIC REPUBLIC OF IRAN,** *et al.*, | ) |
| | ) |
| **Defendants.** | ) |

## MEMORANDUM OPINION AND ORDER

In this long-running case, Shlomo Leibovitch and several of his family members

("Plaintiffs") seek to recover for injuries they suffered as a result of an act of terrorism

committed in Israel with the support of the Islamic Republic of Iran and the Iranian Ministry of

Information ("Defendants"). Presently before the Court are motions to quash filed by non-parties

Bank of Tokyo-Mitsubishi UFJ, Ltd. ("Bank of Tokyo") and BNP Paribas ("Paribas")

(collectively, "the banks"), as well as Plaintiffs' post-judgment motions to compel discovery

from these non-party banks. (R. 133, Bank of Tokyo's Mot. to Quash; R. 139, Bank of Tokyo's

Mot. to Quash; R. 149, Paribas' Mot. to Quash; R. 154, Pls.' Mot. to Compel; R. 158, Pls.' Mot.

to Compel.) For the reasons stated below, the banks' motions are granted and Plaintiffs' motions

are denied.

### BACKGROUND

Several opinions have been issued in this case as it wound its way up to the U.S. Court of

Appeals for the Seventh Circuit and back down again. *See Leibovitch, et al. v. Islamic Republic

of Iran, et al.*, 697 F.3d 561 (7th Cir. 2012); *Leibovitch v. Syrian Arab Republic*, 25 F. Supp. 3d

1071 (N.D. Ill. 2014); *Leibovitch, et al. v. Syrian Arab Republic, et al.*, No. 08 C 1939, 2011 WL

444762 (N.D. Ill. Feb. 1, 2011). The tragic facts underlying the case are repeated here only briefly.

On June 17, 2003, Leibovitch, an Israeli citizen, was driving with several of his family members along a highway in Jerusalem in an area bordering the West Bank. *Leibovitch*, 697 F.3d at 562. Their minivan was hit by bullets, tragically killing seven-year-old Noam Leibovitch and seriously injuring three-year-old Shira Leibovitch. *Id.* It was later learned that the group Palestine Islamic Jihad ("PIJ") had carried out the shooting. *Id.* Believing that the group had connections to the Iranian government, Plaintiffs filed this suit against Defendants pursuant to the Antiterrorism Act ("ATA"), 18 U.S.C. § 2333, and the state-sponsored terrorism exception contained in the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1605A. *Id.* at 562-63. A default was entered after Defendants were served through diplomatic channels but failed to appear. *Id.* at 562. Based on the evidence submitted by Plaintiffs, the Court held Defendants vicariously liable for Plaintiffs' injuries after finding that they had "openly provided material support and resources for the PIJ's campaign of extrajudicial killings." *Id.* Ultimately, default judgment was entered in favor of Plaintiffs totaling nearly $67 million for the physical and emotional injuries they suffered as a result of the attack. (R. 74, Judgment; R. 107, Am. Judgment.)

In an effort to collect on their judgment, Plaintiffs recently served discovery requests and citations to discover assets on Bank of Tokyo and Paribas. (*See* R. 154, Pls.' Mot. to Compel; R. 158, Pls.' Mot. to Compel.) Bank of Tokyo is a Japanese bank headquartered in Tokyo. (R. 168, Cunningham Decl. ¶¶ 2-4.) It has approximately 700 branches in Japan and 75 branches located in 40 other countries; it has a total of 11 branches and offices in the United States, including a branch in Chicago, Illinois. (*Id.*) Its Chicago branch services only a limited number of corporate

customers with offices in the Midwestern United States. (R. 142, Cunningham Suppl. Decl. ¶ 5.) The branch has approximately 70 employees, which represents a small percentage of its 35,000 total employees; the Chicago branch generated approximately .06 percent of the bank's total profits for the fiscal year ending March 2015. (*Id.* ¶¶ 6-7.) Paribas is a French bank with its headquarters in Paris. (R. 152, Christie Decl. ¶ 3.) It has 6,800 branches worldwide, with three branches and three other offices in the United States, including a branch in Chicago. (R. 153, Zambrana Decl., Ex. R at 23, 34.) The Chicago branch employs 47 individuals, which is less than one-tenth of a percent of the 185,000 employees of Paribas worldwide. (*Id.* ¶ 4.) The branch offers a variety of services, but its primary business is providing bank line lending services to U.S. clients. (*Id.*)

The discovery directed at these banks seeks information about Defendants' assets, if any, that the banks hold either here or abroad. Plaintiffs have served identical citations on the banks that purport to compel them to freeze any assets of Defendants that they have, wherever these assets may be located. (R. 138, Viapiano Decl., Ex. A at 6; R. 153, Zambrano Decl., Ex. B.) The citations also require a designated corporate officer of the banks to appear and be examined under oath as to any assets the banks may hold belonging to Defendants. (*See* R. 138, Viapiano Decl., Ex. A at 5-6.) The citations warn that the "failure to comply . . . may result in a judgment being entered against you for the unsatisfied amount of this judgment," or arrest and the imposition of contempt sanctions, including "imprisonment in the county jail." (*Id.* at 6.)

Plaintiffs have also served the banks with document subpoenas pursuant to Federal Rule of Civil Procedure 45, and deposition subpoenas pursuant to Federal Rule of Civil Procedure 30(b)(6). The document subpoenas seek "[d]ocuments sufficient to identify all Iranian Accounts" maintained by the banks from February 2012 to the present. (*Id.*, Ex. B at 19, 22.) "Iranian

Accounts" are defined as "any and all accounts at any and all branches or subsidiaries of [the banks] that belonged to and/or were in the name of, or for the benefit of," Defendants. (*Id.* at 22.) For all such accounts, Plaintiffs seek an array of information, including "[a]ll account opening documents," "[a]ll account customer information" for each account, current balances, detailed transaction histories, and any documents regarding any account closures. (*Id.* at 19-20.)

Similarly, the Rule 30(b)(6) subpoena requires the banks to designate an officer or director who can testify regarding the following matters:

> The details of all financial accounts maintained by [the banks] located anywhere in the world held in the name of, or for the benefit of, Iran . . . . the names and locations of the branches at which such accounts are held, the account numbers on such accounts, the current account balances on such accounts, transaction histories for such accounts and any communications with the Office of Foreign Assets Control of the United States Treasury (OFAC), or any other department or agency of the government of the United States concerning such accounts.

(R. 143, Viapiano Suppl. Decl., Ex. A at 7.)

The banks respond that they have duly searched the records at their Chicago branches and have not located any responsive assets, documents, or information. (R. 152, Christie Decl. ¶ 7; R. 168, Cunningham Suppl. Decl. ¶ 6.) They further assert that they have no employee with knowledge of such accounts at their Chicago branches, and that these local branches do not have access to a centralized database of customer and account information that would allow them to obtain documents and information located at the banks' headquarters, at other branches, or with the banks' affiliates and subsidiaries worldwide.[1] (R. 136, Cunningham Decl. ¶¶ 8-11; R. 152, Christie Decl. ¶ 5.) The banks asked Plaintiffs to voluntarily limit the scope of the subpoenas to records and information located at the Chicago branches, but Plaintiffs would not agree to this

---

[1] The Court notes that the New York branch of Paribas voluntarily coordinated a search for any information available among its six U.S. offices regarding blocked assets of Defendants located in the United States, and at the time of briefing the parties were working out an agreement for the turnover of this information. (*See* R. 159, Pls.' Mem. at 4; R. 160, Tolchin Decl., Ex. D at 2.)

limitation. (R. 138, Viapiano Decl. ¶ 8.) In Plaintiffs' view, the discovery issued requires the banks to "search and produce documents and information located in any . . . branch anywhere in the world." (*Id.*, Ex. C at 25.)

The banks resist being ordered to produce discovery beyond their Chicago branches, as they believe that this Court lacks personal jurisdiction over them and that principles of international comity militate against permitting the expansive, global discovery that Plaintiffs have requested. They argue that determining whether any accounts or documents are held in other bank offices throughout the world would require a burdensome search and, further, that disclosing these records would potentially subject them to civil or criminal liability in their home countries. Therefore, they seek to quash the citations and subpoenas issued by Plaintiffs. (R. 133, Bank of Tokyo's Mot. to Quash; R. 139, Bank of Tokyo's Mot. to Quash; R. 149, Paribas' Mot. to Quash; R. 151, Paribas' Mem.; R. 152, Christie Decl.; R. 153, Zambrano Decl.; R. 168, Cunningham Decl.; R. 169, Wolfe Decl.; R. 172, Banks' Reply; R. 173, Inoshita Decl.; R. 197, Banks' Suppl. to Mot.)

Plaintiffs object to the banks' motions to quash and separately move to compel responses to their discovery requests. (R. 154, Pls.' Mot. to Compel; R. 155, Pls.' Mem.; R. 158, Pls.' Mot. to Compel; R. 159, Pls.' Mem.; R. 160, Tolchin Decl.; R. 164, Pls.' Opp'n; R. 165, Pls.' Opp'n; R. 170, Pls.' Reply.) They acknowledge that they are seeking "discovery concerning Iranian bank accounts maintained by the Bank[s] in [their] overseas branches." (R. 165, Pls.' Opp'n at 1). In their view, personal jurisdiction exists over the banks and it is otherwise proper for the Court to order such relief. (R. 155, Pls.' Mem.; R. 159, Pls.' Mem.) After extensive briefing, these matters are now ripe for decision.[2]

---

[2] The Court commends the attorneys for the excellent manner in which these difficult legal issues were briefed by all sides.

5

## ANALYSIS

Before turning to the parties' discovery dispute, some legal background on the FSIA and

applicable post-judgment discovery procedures is needed. "The default rule of United States law

is that foreign states are immune from suit and attachment of assets in United States courts, but

[the FSIA] provides a number of exceptions and special procedures for such cases." *Wyatt v.*

*Syrian Arab Republic*, 800 F.3d 331, 333 (7th Cir. 2015). As is relevant here, the FSIA provides

that "American nationals may file suit against state sponsors of terrorism in the courts of the

United States."[3] *Bank Markazi v. Peterson*, 136 S. Ct. 1310, 1317 (2016) (citing 28 U.S.C.

§ 1605A.) Specifically, they can seek money damages against a foreign state for personal injury

or death caused by an act of terrorism, including "torture, extrajudicial killing, aircraft sabotage,

hostage taking, or the provision of material support" to terrorist activities. *Id.* (quoting 28 U.S.C.

§ 1605A(a).) But obtaining a judgment against a foreign state is far from the end of the story:

Plaintiffs who prevail under the FSIA "often face[] practical and legal difficulties at the

enforcement stage," *id.* (citation omitted), and must "engage in the costly, burdensome, and often

fruitless task of searching for available assets" to execute their judgment. *Wyatt*, 800 F.3d at 334

(citation omitted).

Several legal principles limit the ability of a prevailing plaintiff from attaching assets of a

foreign state. "Subject to stated exceptions, the FSIA shields foreign-state property from

execution." *Bank Markazi*, 136 S. Ct. at 1318. Additionally, courts in the United States generally

lack authority to "execute against property in other countries." *Republic of Argentina v. NML*

*Capital, Ltd.*, 134 S. Ct. 2250, 2257 (2014). But other foreign-state property is available to

plaintiffs who obtain a judgment under Section 1605A. *Wyatt*, 800 F.3d at 333. Attachable assets

---

[3] Even though the underlying events in this case occurred in Israel, the FSIA applied because Shira Leibovitch is a U.S. citizen. *See Leibovitch*, 697 F.3d at 569.

include "foreign-state property located in the United States" that is "used for a commercial activity." *Bank Markazi*, 136 S. Ct. at 1318 (citing 28 U.S.C. § 1610(a)(7), (b)(3)); *see also Wyatt*, 800 F.3d at 333. Additionally, the Terrorism Risk Insurance Act of 2002 ("TRIA") authorizes execution of judgments obtained under the FSIA's state-sponsored terrorism exception against "the blocked assets" of a terrorist party, its agencies, or its instrumentalities. *Id.* A "blocked asset" is defined as "any asset seized by the Executive Branch pursuant to either the Trading with the Enemy Act (TWEA), or the International Emergency Economic Powers Act (IEEPA)." *Id.* (citations omitted).

The FSIA does not address what post-judgment discovery procedures are available to plaintiffs seeking attachment and execution of a judgment obtained against a foreign state under Section 1601A. *NML Capital*, 134 S. Ct. at 2256 ("There is no [ ] provision forbidding or limiting discovery in aid of execution of a foreign-sovereign judgment debtor's assets."). However, the Federal Rules of Civil Procedure apply to such proceedings, and the Rules governing post-judgment discovery are generally "quite permissive." *Id.* at 2254. Federal Rule of Civil Procedure 69 provides that a judgment creditor "may obtain discovery from any person— including the judgment debtor—as provided in these rules or by the procedure of the state where the court is located." FED. R. CIV. P. 69(a)(2). Plaintiffs here are invoking Illinois citation proceedings, under which a judgment creditor can discover assets of a judgment debtor, and can also compel "the application of non-exempt assets or income discovered toward the payment of the amount due under the judgment." 735 ILL. COMP. STAT. 5/2-1402(a). Service of a citation has the effect of creating a lien on the subject assets. 735 ILL. COMP. STAT. 5/2-1402(m). Because of this latter provision, citation procedures are distinct from an ordinary discovery proceeding: "[A] citation to discover assets is more appropriately considered a document in the nature of a

summons." *Textile Banking Co. v. Rentschler*, 657 F.2d 844, 851 (7th Cir. 1981). "The citation, like a summons, commands the party served commands the party served to appear before the court in regard to the specified cause." *Id.* "Failure to comply with a citation to discover assets is punishable by contempt" and can even subject the respondent to "a judgment for the amount unpaid." *Id.* at 850.

## I.    Personal Jurisdiction

With these principles in mind, the Court turns to the parties' discovery dispute. The threshold issue presented by the parties' motions—and a point on which they strenuously disagree—is whether the Court has personal jurisdiction to take any action against the banks, either in connection with the citation or the discovery requests.[4]

In determining whether personal jurisdiction exists, the Court accepts all well-pleaded allegations in the complaint as true, but may also consider outside materials such as affidavits. *See Felland v. Clifton*, 682 F.3d 665, 672 (7th Cir. 2012). The plaintiff, as the party invoking jurisdiction, bears the burden of establishing that personal jurisdiction exists. *Kipp v. Ski Enter. Corp. of Wisc., Inc.*, 783 F.3d 695, 697 (7th Cir. 2015). When the Court determines personal jurisdiction based on written submissions without holding an evidentiary hearing, the plaintiff

---

[4] Plaintiffs argue in passing that the banks waived their objection to personal jurisdiction by filing a motion for limited intervention in this case. (R. 165, Pls.' Opp. at 4-5.) The Court does not agree. "[T]o waive or forfeit a personal jurisdiction defense, a defendant must give a plaintiff a reasonable expectation that it will defend the suit on the merits or must cause the court to go to some effort that would be wasted if personal jurisdiction is later found lacking." *H-D Mich., LLC v. Hellenic Duty Free Shops S.A.*, 694 F.3d 827, 848 (7th Cir. 2012) (citation omitted). By seeking limited intervention, the banks were following the Local Rules of this Court, which prohibit the filing of any document—other than a motion to intervene—by a person who is not a party to a case. See N.D. ILL. L.R. 5.6. The banks have been steadfastly raising their personal jurisdiction defenses since the beginning of their involvement in this case. (*See, e.g.*, R. 138, Viapiano Decl., Ex. D at 28; R. 143, Viapiano Supp. Decl., Ex. B at 12; R. 151, Paribas' Mem. at 10, R. 153, Zambrano Decl., Ex D at 25; *Id.*, Ex. F. at 40.) By no means have they misled Plaintiffs, nor have they caused this Court to expend unnecessary resources resolving the merits. Under these circumstances, the banks cannot be deemed to have voluntarily submitted to the jurisdiction of this Court. *Compare Continental Bank, N.A. v. Meyer*, 10 F.3d 1293, 1296-97 (7th Cir. 1993) (personal jurisdiction defense was deemed waived after "defendants fully participated in litigation of the merits for over two-and-a-half years without actively contesting personal jurisdiction," and "defendants' delay in urging this threshold issue manifest[ed] an intent to submit to the court's jurisdiction").

8

must establish a *prima facie* case of personal jurisdiction to survive dismissal. *Id.* If the defendant submits declarations or other outside materials challenging personal jurisdiction, the plaintiff has an obligation to submit affirmative evidence supporting the exercise of jurisdiction. *Purdue Research Found. v. Sanofi-Synthelabo, S.A.*, 338 F.3d 773, 782-83 (7th Cir. 2003). Although disputes must be resolved in the plaintiff's favor, unrefuted assertions contained in the defendant's affidavits will be accepted as true. *GCIU-Emp'r Ret. Fund v. Goldfarb Corp.*, 565 F.3d 1018, 1020 n.1 (7th Cir. 2009).

Personal jurisdiction refers to the Court's "power to bring a person into its adjudicative process." *N. Grain Mktg., LLC v. Greving*, 743 F.3d 487, 491 (7th Cir. 2014) (citation omitted). Put simply, jurisdiction to resolve a case on the merits requires "authority over the parties (personal jurisdiction), so that the court's decision will bind them." *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 577 (1999). Therefore, a court must have personal jurisdiction over the respondent in a citation proceeding. *See GE Betz, Inc. v. Zee Co.*, 718 F.3d 615, 630 (7th Cir. 2013) ("[A] third-party citation respondent in Illinois has all of the qualities traditionally associated with a defendant."); *Our Lady of Bellefonte Hosp. v. Ashland GI Servs., LLC*, No. 11 C 6833, 2012 WL 787199, at *2 (N.D. Ill. Mar. 9, 2012) (a court "must possess an independent basis for personal jurisdiction over an individual to whom the court issues a citation"); *Bank of Montreal v. SK Foods, LLC*, No. 09 C 3479, 2011 WL 4578357, at *4 (N.D. Ill. Sept. 30, 2011) ("A court must have personal jurisdiction over the citation respondent in order to have the authority to preside over the citation proceeding."); *Woolard v. Woolard*, No. 05-C-7280, 2009 WL 3150435, at *3 (N.D. Ill. Sept. 23, 2009) ("Courts must have an independent basis [for] personal jurisdiction over an individual to whom it issues a citation.").

Likewise, a court must have personal jurisdiction to order compliance with a discovery request. *Reinsurance Co. of Am. v. Administratia Asigurarilor de Stat*, 902 F.2d 1275, 1281 (7th Cir. 1990) ("A court or agency in the United States, when authorized by statute or rule of court, may order a person subject to its jurisdiction to produce documents, objects, or other information relevant to an action or investigation[.]" (citation omitted)); *Gucci Am., Inc. v. Weixing Li*, 768 F.3d 122, 141 (2d Cir. 2014) ("A district court . . . must have personal jurisdiction over a nonparty to compel it to comply with a valid discovery request under Federal Rule of Civil Procedure 45."); *In re Uranium Antitrust Litig.*, 480 F. Supp. 1138, 1145 (N.D. Ill. 1979) ("Once personal jurisdiction over the person and control over the documents by the person are present, a United States court has power to order production of the documents."); *see also* 16 MOORE'S FEDERAL PRACTICE § 108.125 (3d ed. 2003) ("A nonparty witness cannot be compelled to testify at a trial, hearing, or deposition unless the witness is subject to the personal jurisdiction of the court.").

"[T]he mechanics for asserting personal jurisdiction in federal court are found in Federal Rule of Civil Procedure 4(k)." *KM Enters., Inc. v. Glob. Traffic Techs., Inc.*, 725 F.3d 718, 723 (7th Cir. 2013). In essence, "federal personal jurisdiction is proper whenever the person would be amenable to suit under the laws of the state in which the federal court sits (typically under a state long-arm statute), subject always to the constitutional due process limitations encapsulated in the familiar 'minimum contacts' test." *Id.* Thus, this Court can exercise personal jurisdiction if it would be permitted to do so under the Illinois long-arm statute.[5] *See* FED. R. CIV. P. 4(k)(1)(A); *uBID, Inc. v. GoDaddy Grp., Inc.*, 623 F.3d 421, 425 (7th Cir. 2010). There are two

---

[5] The Illinois long-arm statute permits courts to exercise personal jurisdiction for any reason permitted by the Illinois and United States Constitutions. 735 ILL. COMP. STAT. 5/2-209 (a)(2), (b)(4), (c). Thus, jurisdiction under the Illinois long-arm statute is essentially coextensive with federal due process requirements. *RAR, Inc. v. Turner Diesel Ltd.*, 107 F.3d 1272, 1276 (7th Cir. 1997).

types of personal jurisdiction: general and specific. *Daimler AG v. Bauman*, 134 S. Ct. 746, 753 (2014). Plaintiffs argue that both are proper here, so the Court addresses each in turn.

## A.    General Jurisdiction

"A court may assert general jurisdiction over foreign (sister-state or foreign-country) corporations to hear any and all claims against them" only when the corporation is "essentially at home in the forum State." *Daimler*, 134 S. Ct. at 754 (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011)). "This is a demanding standard that requires the defendant to have such extensive contacts with the state that it can be treated as present in the state for essentially all purposes." *uBID*, 623 F.3d at 426. In *Daimler*, the U.S. Supreme Court rejected an overly expansive view that would permit corporations to be subject to general personal jurisdiction in multiple states, and instead held that affiliations sufficient to support the assertion of general jurisdiction are typically limited to the corporation's place of incorporation and principal place of business. *Daimler*, 134 S. Ct. at 760. The Supreme Court explained that what matters for purposes of general jurisdiction "is not whether a foreign corporation's in-forum contacts can be said to be in some sense continuous and systematic," but "whether that corporation's affiliations with the state are so continuous and systematic as to render it essentially at home in the forum State." *Id.* at 761 (citation and internal quotation marks omitted). Determining whether a corporation is "at home" in a particular state "calls for an appraisal of a corporation's activities in their entirety, nationwide and worldwide," because "[a] corporation that operates in many places can scarcely be deemed at home in all of them." *Id.* at 762 n.20. Instead, for general jurisdiction to exist, the corporation's affiliation with the forum state must be "comparable to a domestic enterprise in that State." *Id.* at 758 n.11.

Thus, following *Daimler*, in all but the most "exceptional" cases general jurisdiction over a corporation is limited to its place of incorporation and/or principal place of business. *Id.* at 761 n.19. The Supreme Court provided the following example of an "exceptional" circumstance that would meet the standard: where a world war forced a foreign company to temporarily relocate its principal place of business to Ohio due to enemy activity abroad. *Id.* at 761 n.19 (citing *Perkins v. Benguet Constr. Mining Co.*, 342 U.S. 437 (1952)). In that circumstance, Ohio had effectively become "a surrogate for the place of incorporation or head office," such that the imposition of general jurisdiction was warranted. *Id.* at 756 n.8

The undisputed evidence before this Court shows that neither bank is incorporated in this state or has its principal place of business here. They both have a branch in Illinois, and while the existence of a single branch within the forum state was once thought a sufficient basis to exercise general jurisdiction over a foreign bank, this practice is no longer valid after *Daimler*. *See, e.g.*, *Gucci*, 768 F.3d at 135 (after *Daimler*, non-party foreign bank was not subject to general personal jurisdiction in New York simply because it maintained and operated branch offices there); *Hill v. Capital One Bank (USA), N.A.*, No. 14-CV-6236, 2015 WL 468878, at *6-7 (N.D. Ill. Feb. 3, 2015) (Delaware bank with corporate headquarters in Virginia was not "at home" in Illinois under *Daimler* even though it had ATM and customer help center in Illinois); *Nicholson v. E-Telequote Ins., Inc.*, No. 14-CV-4269, 2015 WL 5950659, at *4 (N.D. Ill. Oct. 13, 2015) ("[D]oing 10 percent of your business in Illinois does not make a corporation 'at home' in Illinois.").

Indeed, *Daimler* explicitly criticized the practice asserting personal jurisdiction based on the presence of a branch in the forum state and noted that the cases applying this rule "should not attract heavy reliance today." *Daimler*, 134 S. Ct. at 761 n.18. In the Supreme Court's view, such

an expansive view of personal jurisdiction was "unacceptably grasping."[6] *Id.* at 761. Plaintiffs do not argue that exceptional circumstances like those outlined in *Daimler* are present here, nor can the Court discern any such circumstances from the record. Under *Daimler*, these banks are not "at home" in this state simply because they have a branch here. Therefore, the Court finds that general jurisdiction is lacking.

Plaintiffs try to resist this outcome by arguing that *Daimler* only applies to defendants, and not to third parties. (R. 170, Pls.' Reply at 2-5.) However, the Court cannot discern any valid reason why *Daimler* would not apply any time the Court is called to decide personal jurisdiction. The policies behind the requirement of personal jurisdiction were outlined by the Supreme Court as follows:

> [T]he requirement represents a restriction on judicial power not as a matter of sovereignty, but as a matter of individual liberty. . . .The defendant must generally hire counsel and travel to the forum to defend itself from the plaintiff's claim, or suffer a default judgment. The defendant may be forced to participate in extended and often costly discovery, and will be forced to respond in damages or to comply with some other form of remedy imposed by the court should it lose the suit. The defendant may also face liability for court costs and attorney's fees. These burdens are substantial, and the minimum contacts requirement of the Due Process Clause prevents the forum State from unfairly imposing them upon the defendant.

*Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 807-08 (1985) (citations and internal quotation marks omitted). This same rationale applies to non-parties like the banks: they have been haled into a foreign court, required to obtain counsel to represent their interests, and risk the imposition of a judgment and/or sanctions if they fail to comply with Plaintiffs' filings.

---

[6] Plaintiffs rely heavily on *Wultz v. Bank of China Ltd.*, 298 F.R.D. 91 (S.D.N.Y. 2014), in which a district court in New York ordered discovery against a non-party foreign bank under similar facts. (*See* R. 166, Pls.' Opp. at 3-4; R. 170, Pls.' Reply at 15.) But there the bank did not contest personal jurisdiction. The court noted *in dicta* that personal jurisdiction existed because the bank "does business in New York and has a branch office in New York City." *Wultz*, 298 F.R.D. at 95 n.12. But the Second Circuit later held that this reasoning is no longer viable after *Daimler*. *See Gucci*, 768 F.3d at 135 ("[A]pplying the Court's recent decision in *Daimler*, the district court may not properly exercise general personal jurisdiction over the Bank [because] . . . the non-party bank [] has branch offices in the forum, but is incorporated and headquartered elsewhere."). The Court therefore does not find it appropriate to rely on *Wultz*.

13

For this reason, other courts have applied *Daimler* and earlier Supreme Court decisions addressing personal jurisdiction generally to cases involving third parties. *See Gucci*, 768 F.3d at 136-37 ("Lower federal courts . . . have adapted the test for civil defendants for use in assessing the question whether they may properly exercise jurisdiction over a nonparty."); *Our Lady of Bellefonte*, 2012 WL 787199, at *3 (applying "*International Shoe* and its progeny" to determine whether it had personal jurisdiction over non-party for the purpose of ordering discovery). Indeed, the rationale behind the personal jurisdiction requirement seems particularly relevant here, as Plaintiffs are not just seeking discovery from the banks but are also pursuing citation proceedings, which, given their unique structure, are quite similar to a lawsuit. *See GE Betz, Inc.*, 718 F.3d at 630; *Textile Banking Co.*, 657 F.2d at 851. If anything, one would think that a more restrictive standard should apply when assessing personal jurisdiction over non-parties, not a looser one, because unlike defendants they are not accused of violating the plaintiff's rights and essentially have "no dog in the fight." *See* Ryan W. Scott, *Minimum Contacts, No Dog: Evaluating Personal Jurisdiction for Nonparty Discovery*, 88 MINN. L. REV. 968, 995-1004 (2004). For these reasons, the Court is unconvinced by Plaintiffs' argument.

Plaintiffs also argue that the banks should be deemed "at home" in Illinois because they are registered to do business under the state's Foreign Banking Office Act. (R. 170, Pls.' Reply at 5 (citing 205 ILL. COMP. STAT. 645/3).) The Foreign Banking Office Act says nothing about consent to jurisdiction, but Plaintiffs point out that under Illinois law foreign banks, like Illinois banks, have the capacity to "sue or be sued." (*Id.* (citing 205 ILL. COMP. STAT. 5/5(1)).) This is an accurate statement of the law, but it does not show that personal jurisdiction exists over the banks. The ability to sue or be sued pertains to a party's *capacity*, as outlined in Federal Rule of Civil Procedure 17(b). This is not the same as personal jurisdiction. "Capacity to sue or be sued

14

does *not* mean a defendant's amenability to suit in a particular judicial district, which is a matter of the existence or nonexistence of personal jurisdiction over a defendant there." *LaSalle Nat'l Bank v. Kearon*, No. 98 C 5099, 1998 WL 901685, at *1 (N.D. Ill. Dec. 17, 1998) (internal quotation marks omitted); *see also Swaim v. Moltan Co.*, 73 F.3d 711, 716-18 (7th Cir. 1996) (noting distinctions between lack of capacity and personal jurisdiction defenses). This general language in the statute pertaining to capacity does not establish that personal jurisdiction exists over the banks.

Plaintiffs also argue that general jurisdiction exists because the Illinois registration statute requires foreign banks operating within the state to appoint a registered agent for service of process. (R. 159, Pls.' Mem. at 8 (citing 205 ILL. COMP. STAT. 645/9, 645/10).) They point to *Employers Insurance of Wausau v. Banco De Seguros Del Estado*, 199 F.3d 937 (7th Cir. 1999), in which the Seventh Circuit held that "[b]y designating a local agent to serve process," the defendant had "knowingly waived its right to dispute personal jurisdiction." *Id.* at 943. Notably, the defendant in that case had expressly agreed to "submit to the jurisdiction of any Court of competent jurisdiction within the United States" and to "comply with all requirements necessary to give such Court jurisdiction" pursuant to a private contract; thus, the Seventh Circuit was not called to decide the effect of the state statute at issue here. *See id.* at 939. Indeed, in a case decided before *Wausau*, the Seventh Circuit considered and rejected an argument similar to Plaintiffs made under Indiana's foreign corporation registration statute. *Wilson v. Humphreys (Cayman) Ltd.*, 916 F.2d 1239, 1245 (7th Cir. 1990) ("Registering to do business is a necessary precursor to engaging in business activities in the forum state," but it cannot "standing alone" satisfy "the demands of due process" necessary to assert personal jurisdiction); *see also ACUITY v. Roadtec, Inc.*, No. 13-CV-6529, 2013 WL 6632631, at *5 (N.D. Ill. Dec. 16, 2013) (applying

15

*Wilson* and holding that corporate defendant was not subject to general jurisdiction in Illinois even though it was registered to conduct business and had appointed an agent for service of process in Illinois).

Additionally, *Wausau* was decided long before the Supreme Court's opinion in *Daimler*. After *Daimler*, numerous district courts in this Circuit have concluded that registering to do business in a state and/or designating a registered agent for service of process is not enough to make a corporation "at home" in that state. *See, e.g.*, *Dimitrov v. Nissan N. Am., Inc.*, No. 15 C 06332, 2015 WL 9304490, at *4-5 (N.D. Ill. Dec. 22, 2015) (applying "the lessons of *Daimler*" and holding that the court did not have general jurisdiction over foreign corporation simply because it was registered to do business in Illinois and conducted a small portion of its operations there); *U.S. Bank Nat'l Ass'n v. Bank of Am., N.A.*, No. 1:14-CV-01492-TWP, 2015 WL 5971126, at *6 (S.D. Ind. Oct. 14, 2015) (declining to following *Wausau* and holding that "[m]erely registering to do business in Indiana . . . and also appointing an agent for purposes of service of process, does not establish personal jurisdiction over a corporation"); *Shrum v. Big Lots Stores, Inc.*, No. 3:14-CV-03135-CSBDGB, 2014 WL 6888446, at *2, *7 (C.D. Ill. Dec. 8, 2014) (foreign corporation was not "at home" in Illinois even though its contacts with Illinois were "fairly extensive and deliberate"—including having a physical facility in Illinois, registering to do business in the state, and maintaining a registered agent for service of process in the state—as such contacts were insufficient under *Daimler*); *Sullivan v. Sony Music Entm't*, No. 14 CV 731, 2014 WL 5473142, at *3 (N.D. Ill. Oct. 29, 2014) (foreign corporation was not "at home" in Illinois even though it was registered to do business there, maintained a registered agent for service of process, and operated a distribution facility in the state, because such contacts fell short of what was required by *Daimler*).

Indeed, even under Illinois law, the appointment of a registered agent is not determinative in the personal jurisdiction analysis. *Alderson v. Southern Co.*, 747 N.E.2d 926, 944 (Ill. App. Ct. 2001) (holding that foreign corporation was not "doing business" in Illinois, and thus personal jurisdiction was lacking, even though corporation had some contact with the state and maintained a registered agent here, because "[t]here is nothing in [the Illinois Code of Civil Procedure] that supports asserting *in personam* jurisdiction over a corporate defendant simply because the plaintiff served summons upon the defendant's Illinois registered agent."). This interpretation is notable because, as the Supreme Court recognized in *Daimler*, for a federal court to exercise personal jurisdiction over a foreign corporation its affiliation with the forum state must be "comparable to a domestic enterprise in that State." *Daimler*, 134 S. Ct. at 758 n.11. For the reasons outlined above, the banks do not have sufficient connections to Illinois to meet this standard.

Plaintiffs rely on *Vera v. Republic of Cuba*, 91 F. Supp. 3d 561 (S.D.N.Y. 2015), in which a court in the Southern District of New York ordered discovery from a third-party foreign bank under similar circumstances. (*See* R. 159, Pls.' Mem. at 9.) The Court does not find *Vera* persuasive. Indeed, the court in *Vera* acknowledged that after *Daimler*, courts can no longer exercise general jurisdiction over a foreign corporation simply because it has a branch office within the forum state. *Vera*, 91 F. Supp. 3d at 566-67. Instead, the court hinged its jurisdiction on the third party's "consent" to personal jurisdiction by registering to do business in the forum

state.[7] *Id.* at 570-71. But this reasoning has since been rejected by the Second Circuit. After *Vera* was decided, the Second Circuit expressly held that in light of *Daimler*, a foreign corporation's compliance with state registration and agent-appointment statutes did not give rise to general jurisdiction, even though "they might have sufficed under the more forgiving standard that prevailed in the past." *Brown v. Lockheed Martin Corp.*, 814 F.3d 619, 626 (2d Cir. 2016). As discussed above, district courts in this Circuit applying *Daimler* have reached the same conclusion. *See Dimitrov*, 2015 WL 9304490, at *4-5; *Shrum*, 2014 WL 6888446, at *7; *Sullivan*, 2014 WL 5473142, at *3.

Plaintiffs also rely on the Supreme Court's majority opinion in *Republic of Argentina v. NML Capital* for the proposition that broad post-judgment discovery should be permitted in FSIA execution proceedings. (*See* R. 165, Pls.' Opp'n at 2; R. 170, Pls.' Reply at 1-5.) In that case, the Supreme Court held that the FSIA does not contain any provisions forbidding or limiting the scope of discovery in aid of execution of a foreign state's assets. 134 S. Ct. at 2257-58. However, *NML Capital* did not address the threshold issue of personal jurisdiction in such proceedings, as no one raised a challenge to personal jurisdiction; rather, the "single, narrow question" before the Court was whether the FSIA required different discovery rules "when the judgment debtor is a foreign state." *Id.* at 2255. The case is thus of little assistance in deciding the parties' dispute over personal jurisdiction. For all these reasons, the Court concludes that it does not have general jurisdiction over the banks.

---

[7] *Vera* is also factually distinguishable because there the court specifically noted that the documents requested by the subpoena could be "found via electronic searches performed in [the bank's] New York office, and are within this jurisdiction." *Vera*, 91 F. Supp. 3d at 571. The banks here have submitted evidence that they have no responsive documents at their Chicago branches and do not have access to a centralized database that would permit them to search for documents located at their headquarters or at other branches, subsidiaries, or affiliates throughout the world. (R. 136, Cunningham Decl. ¶¶ 8-11; R. 152, Christie Decl. ¶ 5.) The Court also notes that the Second Circuit never reviewed the merits of the district court's order in *Vera*, as it determined that the order was not reviewable as a final decision under 28 U.S.C. § 1291 or as an interlocutory order under 28 U.S.C. § 1292. *Vera v. Republic of Cuba*, 802 F.3d 242, 246-49 (2d Cir. 2015).

## B. Specific Jurisdiction

That is not the end of the matter, however, because Plaintiffs also argue that the Court can exercise specific jurisdiction over the banks. (R. 159, Pls.' Mem. at 10-13.) Specific jurisdiction requires a plaintiff to show that the controversy between the parties "arises out of the forum-related activity." *Advanced Tactical Ordnance Sys., LLC v. Real Action Paintball, Inc.*, 751 F.3d 796, 800 (7th Cir. 2014). The exercise of specific jurisdiction is proper if two requirements are met: the defendant's conduct must satisfy the "minimum contacts" test, and the "maintenance of the suit [must] not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (citation and internal quotation marks omitted).

### 1. Minimum Contacts

To establish the requisite minimum contacts to support specific jurisdiction, "not just any contacts will do: For a State to exercise jurisdiction consistent with due process, the defendant's *suit-related* conduct must create a substantial connection with the forum State." *Advanced Tactical*, 751 F.3d at 801 (citing *Walden v. Fiore*, 134 S. Ct. 1115, 1121 (2014)); *see also GCIU-Emp'r Ret. Fund*, 565 F.3d at 1024 (for specific jurisdiction to exist, the plaintiff's cause of action "must *directly arise* out of the specific contacts between the defendant and the forum state" (citation omitted)). Additionally, the defendant's connections to the forum must arise out of contacts that he himself created. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985). "Contacts between the plaintiff . . . and the forum do not satisfy this requirement." *Advanced Tactical*, 751 F.3d at 801.

Applying these principles here, it is apparent that there is virtually no link between the in-state banking activities of these French and Japanese banks and Plaintiffs' claims arising from a

terrorist attack that occurred in Israel with the support of the Iranian government. It certainly cannot be said that Plaintiffs' claims "directly arise" out of the banking activities of these local branches. *See GCIU*, 565 F.3d at 1024. Thus, under traditional legal principles, specific jurisdiction is lacking.

Although the Seventh Circuit has not addressed this issue, two Circuits have reformulated the minimum-contacts inquiry in cases involving third-party discovery, focusing more narrowly "on the connection between the nonparty's contacts with the forum and the discovery order at issue." *Gucci*, 768 F.3d at 137; *see also S.E.C. v. Knowles*, 87 F.3d 413, 418 (10th Cir. 1996) (holding that court's exercise of specific jurisdiction was proper where subpoena enforcement action arose out of nonparty's contacts with the forum). It is unclear whether this test is proper, as the Supreme Court has never expressly addressed specific jurisdiction over non-parties. *See Gucci*, 768 F.3d at 136. But even if the narrower inquiry is the proper one, there is still an insufficient link between the in-state activities of these foreign banks and the discovery sought by Plaintiffs. There is evidence that the banks hold no accounts for Defendants in Illinois or anywhere within the United States. Yet Plaintiffs seek vast discovery from the Chicago branches of these banks related to Defendants' assets located abroad.

Plaintiffs point out that these two banks have been found guilty of wrongdoing by regulators, in that they processed financial transactions involving Sudan, Iran, Burma, and other countries with which the United States does not conduct business. Specifically, Paribas pled guilty to processing transactions on behalf of these countries that should have been blocked under U.S. Treasury regulations. (R. 160, Tolchin Decl., Ex. H-J.) Bank of Tokyo, in turn, was sanctioned by the New York State Department of Financial Services for misleading the department and violating New York banking laws in connection with U.S. dollar-clearing

transactions conducted on behalf of Sudanese, Iranian, and Burmese parties. (R. 156, Tolchin Decl., Ex. G.) This conduct is certainly far from commendable, but Plaintiffs have not demonstrated an adequate connection between these wrongful activities and the banks' branches in Illinois.[8]

Plaintiffs argue that the proper minimum contacts test should look to the banks' activities within the United States as a whole, not just the state of Illinois, because this action arises under the ATA. (R. 155, Pls.' Mem. at 10-11; R. 170, Pls.' Reply at 7.) When a federal statute that creates a cause of action prescribes its own rules for service of process, "the Federal Rules provide that service made according to the statute is effective to establish personal jurisdiction over the defendant, regardless of whether a court of the state encompassing the federal district could exercise personal jurisdiction over the defendant." *Waeltz v. Delta Pilots Ret. Plan*, 301 F.3d 804, 807 n.3 (7th Cir. 2002). In such a case, the personal jurisdiction analysis turns on whether the defendant has sufficient minimum contacts with the United States as a whole, rather than just with the forum state. *Id.*

The ATA does in fact contain its own service provision that authorizes nationwide service of process.[9] 18 U.S.C. § 2334(a). But Plaintiffs are not proceeding with a substantive

---

[8] As to Paribas, the record shows that its "subsidiary in Geneva ('BNPP Suisse') and branch in Paris ('BNPP Paris') facilitated or conducted the overwhelming majority of the apparent violations of U.S. sanctions laws." (R. 160-8, Tolchin Decl., Ex. H at 2.) As to Bank of Tokyo, some of the dollar-clearing transactions—a process by which U.S. dollar-denominated transactions are satisfied between counterparties through a U.S. bank—were settled through its New York branch and other New York-based financial institutions. (R. 156-7, Tolchin Decl., Ex. G at 2 & n.1.) However, the bulk of the wrongdoing was attributed to high-ranking corporate officers, including its Compliance Manager and Executive Officer of the Global Planning Division, who were located abroad. (*See id.* at 10-11.)
[9] The FSIA also contains special provisions relating to service of process over foreign states. 28 U.S.C. § 1608(b). Plaintiffs do not argue, nor can the Court discern, how provisions pertaining to service on a foreign sovereign might be applicable to a third-party discovery dispute involving a private bank. Indeed, the FSIA is quite unique, in that there is generally no need to conduct a minimum-contacts analysis in a case against a foreign state under the FSIA because the statute expressly provides that personal jurisdiction exists over the defendant as long as subject matter jurisdiction exists and service was proper. 28 U.S.C. § 1330(b) ("Personal jurisdiction over a foreign state shall exist as to every claim for relief over which the district courts have jurisdiction under subsection (a) where service has been made under section 1608 of this title.").

21

claim against the banks under the ATA; instead, this is a post-judgment proceeding against non-parties under Rule 69. Additionally, the ATA's nationwide service provision is triggered only if the action is filed in one of the venues specified in that statute. *Wultz v. Islamic Republic of Iran*, 762 F. Supp. 2d 18, 25-26 (D.D.C. 2011) ("[P]roperly understood, invocation of the ATA's provision of nationwide service of process rests on the satisfaction of its venue clause."). This is in accord with how the Seventh Circuit has interpreted another federal statute with similar language. *KM Enters.*, 725 F.3d at 730 ("To avail oneself of the privilege of nationwide service of process [under the Clayton Act], a plaintiff must satisfy the venue provisions of the [Act]. If she wishes to establish venue exclusively through [the general venue requirements under 28 U.S.C. § 1391], she must establish personal jurisdiction some other way.").

Plaintiffs do not argue—nor is it clear from the record—that the special venue provisions contained in the ATA are satisfied in this case. To satisfy the ATA's venue requirements, an action must be filed in a district "where any plaintiff resides," or in any district where "any defendant resides or is served, or has an agent." 18 U.S.C. § 2334(a). Plaintiffs asserted generally in the complaint that "[v]enue is proper in this Court pursuant to 18 U.S.C. § 2334(a)," without specifying which provision applies. (R. 1, Compl. ¶ 4.) There is nothing before the Court to suggest that any of the Plaintiffs reside in this District, and in fact Plaintiffs have been obtuse about this issue, stating in their briefing that their place of residence is "not relevant." (R. 170, Pls.' Reply at 8-9.) It is also apparent from the record that Defendants do not reside in this District, have no agent here, and were not served here. Instead, Defendants were served through diplomatic channels by the Swiss Embassy in Tehran, Iran, at the request of the U.S. Department of State in Washington, D.C. (R. 26, Return of Service.)

22

Because of these complicating factors, the Court finds it difficult to rely on the cases cited by Plaintiffs where courts found that the appropriate inquiry in a suit involving the ATA is the defendant's minimum contacts with the United States as a whole. *See, e.g., In re Terrorist Attacks on Sept. 11, 2001*, 349 F. Supp. 2d 765, 806 (S.D.N.Y. 2005) (where personal jurisdiction is asserted under the ATA's nationwide service provision, the "relevant inquiry under such circumstances is whether the defendant has minimum contacts with the United States as a whole [to satisfy Fifth Amendment due process requirements], rather than . . . with the particular state in which the federal court sits."). If the nationwide service of process provision is inapplicable, personal jurisdiction must accord with that of the forum state. *Felland*, 682 F.3d at 672; *see also Wultz*, 762 F. Supp. 2d at 30 (where nationwide service provision of ATA did not apply, defendant had to have sufficient minimum contacts with the forum state, not the United States as a whole, for personal jurisdiction to exist); *FTC v. Cleverlink Trading Ltd.*, No. 05 C 2889, 2006 WL 1735276, at *4 (N.D. Ill. June 19, 2006) ("Absent such a nationwide service of process provision, due process requires that a person or corporation have minimum contacts with the forum state before a court may exercise personal jurisdiction.").

But even if the Court were to consider the banks' activities within the United States as a whole, while it presents closer question, the Court would still find an insufficient link between the discovery sought and the banks' activities to warrant the exercise of specific jurisdiction. It bears repeating that these banks conduct a very small portion of their business in the United States when considering their operations as a whole. Bank of Tokyo has 11 branches in the United States out of 700 worldwide. (R. 168, Cunningham Decl. ¶¶ 2-4.) Its operations in the United States made up approximately 3.9 percent of its total profits for the fiscal year ending

March 2015.[10] (*Id.* ¶ 5.) Paribas has a total of six branches and offices in the United States out of thousands worldwide. (R. 152, Christie Decl. ¶ 3; R. 153, Zambrana Decl., Ex. R at 34.) As of 2015, it had worldwide assets totaling approximately \$2.3 trillion, with around \$77 billion (roughly three percent) being located in the United States. (R. 169, Wolfe Decl., Exs. A-F.)

Although there is evidence that the banks availed themselves of the U.S. banking system to process certain transactions that should have been blocked under federal law, the discovery sought by Plaintiffs is not limited to those specific transactions. It is far more expansive, as Plaintiffs are seeking detailed information related to *any* accounts held by Defendants *anywhere* in the world. Evidence that these non-party banks conducted general banking activities within the United States that in some way benefitted Defendants is not sufficient to support the exercise of specific jurisdiction. *See In re Terrorist Attacks on Sept. 11, 2001*, 718 F. Supp. 2d 456, 488-89 (S.D.N.Y. 2010) (the provision of "routine banking services" that benefitted a terrorist organization "in some general, nondescript manner" will not support the exercise of specific personal jurisdiction based on the contacts created by the provision of such services). Thus, even under the more generous minimum-contacts test, the Court concludes that Plaintiffs have not met

---

[10] In one of their filings, Plaintiffs state that Bank of Tokyo's operations in the United States represented "approximately 15%-19% of [the bank's] gross profits in 2014," citing generally to "Exs. I-K to Tolchin Decl." without reference to any particular document or page number. (R. 155, Pls.' Mem. at 2.) The exhibits they reference consist of general corporate materials and press releases. The Court has examined these exhibits in detail and cannot discern how Plaintiffs are deriving this figure. Bank of Tokyo has asserted in a sworn declaration that its operations in the United States make up less than four percent of its total profits. (R. 168, Cunningham Decl. ¶ 5.) It is Plaintiffs' burden to establish that jurisdiction exists, and their vague assertion is not enough to rebut the bank's sworn declaration. *See GCIU-Emp'r Ret. Fund*, 565 F.3d at 1020 n.1. Additionally, while the larger number might make the issue closer, given all of the other factors at play, the Court would not find the difference outcome determinative.

24

their burden of establishing that the present discovery dispute arises out of the banks' forum-related activities.[11]

## 2. Principles of Fairness

Assuming Plaintiffs could satisfy the minimum-contacts test, the Court must also consider whether the exercise of jurisdiction comports with "fair play and substantial justice" under the circumstances of this case. *Burger King Corp.*, 471 U.S. at 476. When foreign parties are involved, the Court must consider "the procedural and substantive policies of other nations whose interests are affected by the assertion of jurisdiction." *Asahi Metal Indus. Co. v. Superior Ct. of Cal., Solano Cty.*, 480 U.S. 102, 115 (1987) (emphasis omitted). This requirement reflects an understanding that the interests of foreign nations, "as well as the Federal interest in Government's foreign relations policies," are "best served by a careful inquiry into the reasonableness of the assertion of jurisdiction in the particular case, and an unwillingness to find the serious burdens on an alien defendant outweighed by minimal interests on the part of the plaintiff or the forum State." *Id.* The Supreme Court has cautioned that "[g]reat care and reserve should be exercised when extending our notions of personal jurisdiction into the international field." *Id.* (citation omitted).

In determining whether the assertion of jurisdiction is reasonable, the Court should consider such factors as the burden on the foreign defendant, the interests of the forum, the

---

[11] Plaintiffs point to the district court's decision on remand in *Gucci*, in which the court found the exercise of specific jurisdiction proper, but in that case there was a far greater link between the non-party bank's activities in the forum and the discovery requested by the plaintiffs. *See Gucci*, 2015 WL 5707135, at \*5, \*9 (specific jurisdiction existed over non-party foreign bank with branch in New York for purposes of ordering production of defendant's bank account information in trademark infringement case, where subpoena requests were "premised on the fact that Defendants' proceeds from the sale of counterfeit goods were transferred through [the bank's] account in New York," and there was a "strong relationship" between the bank's "New York conduct" and the document requests); *see also Strauss v. Credit Lyonnais, S.A.*, --- F. Supp.3d ---, 2016 WL 1305160, at \*17-19 (E.D.N.Y. Mar. 31, 2016) (exercising specific jurisdiction over defendant foreign bank in New York where the plaintiffs demonstrated a "close relatedness" between the plaintiffs' aiding-and-abetting claims under the ATA and the bank's "New York conduct"; the bank routinely used its New York branch to clear the transfers at issue, the transfers overlapped with terrorist attacks that caused plaintiffs' injuries, and the was alleged to have known that the funds it was transferring were being used to support the terrorist organization).

25

plaintiff's interest in obtaining relief in the forum, and the interests of other sovereigns. *Id.* at 113. Of these factors, the "burden on the defendant forced to litigate in a foreign forum is still the primary concern." *Labtest Int'l, Inc. v. Ctr. Testing Int'l Corp.*, 766 F. Supp. 2d 854, 864 (N.D. Ill. 2011) (citation omitted); *see also Asahi*, 480 U.S. at 114 ("[T]he unique burdens placed upon one who must defend oneself in a foreign legal system should have significant weight in assessing the reasonableness of stretching the long arm of personal jurisdiction over national borders.").

The record shows that the far-reaching discovery sought by Plaintiffs would impose a heavy burden on these foreign non-party banks, both of which are headquartered thousands of miles from this Court. The Chicago branches of these foreign banks have no responsive documents or information in their possession, nor do they have access to a centralized database to conduct a global search for responsive documents in their home countries or the many other countries in which they operate. It seems unlikely that these foreign banks would have envisioned that operating a handful of branches in the United States—out of hundreds or thousands worldwide—would subject them to vast discovery in an Illinois lawsuit to which they are not a party.

The banks have also submitted convincing evidence that disclosing responsive information located abroad would violate the laws of their home countries.[12] Under Japanese law, it is unlawful for Japanese commercial banks to disclose information about customer accounts in Japan, or to freeze such accounts absent an order from a Japanese court. (R. 137, Inoshita Decl. ¶ 9(a).) If a Japanese bank were to take such actions, the bank, its officers, or its employees could be subjected to civil liability, regulatory action, or even criminal sanctions. (*Id.*

---

[12] "In determining foreign law, the court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence." FED. R. CIV. P. 44.1.

¶¶ 9(b), 23.) Disclosure of the information could also make the bank liable to the customer for breach of the duty of confidentiality. (*Id.* ¶¶ 18, 25.) Additionally, if a Japanese bank seizes or transfers funds without authorization from a Japanese court, such action has no legal effect; in other words, the bank would remain liable to the depositor and could face "double liability" for the funds deposited.[13] (*Id.* ¶¶ 9(c), 23.)

Similarly, French law prohibits the production of bank records located in France for use in civil discovery elsewhere, except when the documents are requested in compliance with an international convention, such as the Hague Convention, or through procedures available under French law. (*See* R. 153, Zambrano Decl., Ex. K at 65-67; *Id.*, Ex. L at 93-95.) Violation of bank secrecy provisions can result in the imposition of civil or even criminal sanctions. (*Id.*, Ex. K at 65-67.) These provisions have been enforced "at least a dozen" times since 2006. *In re Activision Blizzard, Inc.*, 86 A.3d 531, 538 (Del. Ch. 2014) (describing enforcement actions under the French Data Protection Act). In addition, the Court of Justice of the European Union, the European Union's highest court, recently invalidated a safe-harbor framework negotiated between the European Union and the United States in 2000, making it more difficult for companies based in Europe to transfer customer data to the United States. *See* Case C-362/14, *Schrems v. Data Prot. Comm'r*, 2015 E.C.R. 1-1, *available at*

http://curia.europa.eu/jcms/upload/docs/application/pdf/2015-10/cp150117en.pdf. This ruling has been "hailed as a strong vindication of Europeans' fundamental right of privacy." *See* Julie Brill, Commissioner, Fed. Trade Comm'n, Keynote Address at the Amsterdam Privacy Conference, *Transatlantic Privacy After Schrems: Time for An Honest Conversation*, 2015 WL

---

[13] By contrast, a domestic bank in Illinois is protected from the risk of double liability by statute. *See* 735 ILL. COMP. STAT. 5/12-712.

9684096, at *2 (Oct. 23, 2015). These considerations weigh against exercising jurisdiction to order compliance with Plaintiffs' discovery requests.

On the other hand, there is no doubt that this is an important case, or that the United States (and the state of Illinois) has a strong interest in combatting terrorism and providing a remedy for its victims. Yet the Court must consider that only one of the eight plaintiffs is a U.S. citizen and that the events giving rise to this suit occurred in another country. None of the Plaintiffs appear to have any link to this District (indeed, it is not clear that they are even living in the United States), and their lead attorneys are located in New York and Israel. Under these circumstances, their interest in litigating in this District is somewhat "diminished." *See McGill v. Gigantex Techs. Co.*, No. 05C5892, 2005 WL 3436403, at *4 (N.D. Ill. Dec. 12, 2005). It also does not appear that litigating in this District would result in an efficient resolution of this matter, as the responsive documents and knowledgeable witnesses are all located outside of this forum. *See id.*

Based on a careful consideration of the competing interests at stake, the Court concludes that principles of fairness militate against exercising jurisdiction over the banks in this District to require them to comply with Plaintiffs' broad discovery requests. *See Asahi*, 480 U.S. at 116 (in light of the "international context, the heavy burden on the alien defendant, and the slight interest of the plaintiff and the forum State," exercise of personal jurisdiction over Japanese corporation in California "would be unreasonable and unfair"); *Labtest Int'l*, 766 F. Supp. 2d at 864-65 (applying *Asahi* factors and concluding that the exercise of jurisdiction over Chinese corporation in Illinois was not proper, where company was headquartered nearly 8,000 miles away, no responsive records were located in Illinois, and the events giving rise to the lawsuit occurred in China and did not impact Illinois residents); *McGill*, 2005 WL 3436403, at *4 (applying *Asahi*

and concluding that based on the substantial burden on the foreign defendant and the fact that the plaintiff was not an Illinois resident, the exercise of personal jurisdiction in Illinois over Taiwanese company "would be unfair"). For all these reasons, the Court concludes that personal jurisdiction is lacking.

## II. International Comity Concerns

Assuming for the sake of argument that Plaintiffs could satisfy the requirements of personal jurisdiction, the Court still must consider international comity concerns before ordering discovery in this case. *See Société Nationale Industrielle Aérospatiale v. U.S. Dist. Ct. for the S. Dist. of Iowa*, 482 U.S. 522, 546 (1987) ("American courts should . . . take care to demonstrate due respect for any special problem confronted by the foreign litigant on account of its nationality or the location of its operations[.]"); *Gucci*, 768 F.3d at 138-40 (directing district court on remand to conduct a comity analysis that considered non-party foreign bank's obligations under foreign law before ordering discovery from the bank). Comity is not a jurisdictional requirement, but refers instead to the "spirit of cooperation in which a domestic tribunal approaches the resolution of cases touching the laws and interests of other sovereign states." *Aérospatiale*, 482 U.S. at 543 n.27.

As discussed above, the banks have submitted evidence that the laws of their home countries prohibit the disclosures sought by Plaintiffs in this case, and that their failure to comply with these laws could subject them to civil or criminal liability. "The fact that foreign law may subject a person to criminal sanctions in the foreign country if he produces certain information does not automatically bar a domestic court from compelling production." *United States v. First Nat'l Bank of Chi.*, 699 F.2d 341, 345 (7th Cir. 1983); *see also Aérospatiale*, 482 U.S. at 546 n.29 ("It is well settled that [foreign non-disclosure] statutes do not deprive an American court of

the power to order a party subject to its jurisdiction to produce evidence even though the act of production may violate that statute."). However, it does require the Court to conduct a "sensitive balancing of the competing interests at stake." *First Nat'l Bank of Chi.*, 699 F.2d at 345. Indeed, even when there is no direct conflict with foreign law, "courts are well advised to proceed cautiously any time they order discovery involving activity within another country." *Graco, Inc. v. Kremlin, Inc.*, 101 F.R.D. 503, 510 n.9 (N.D. Ill. 1984).

In balancing the interests at stake, courts ordinarily employ the Restatement (Third) of Foreign Relations Law of the United States ("the Restatement"). *See Reinsurance Co. of Am.*, 902 F.2d at 1281-82; *First Nat'l Bank of Chi.*, 699 F.2d at 345.[14] Under the Restatement, a court should not exercise its jurisdiction "to prescribe law with respect to a person or activity having connections with another state when the exercise of such jurisdiction is unreasonable." Restatement § 403(1). The Restatement provides specific guidance on discovery requests that require production of information located abroad, and directs the Court to consider the following factors before ordering discovery:

> [T]he importance to the investigation or litigation of the documents or other information requested; the degree of specificity of the request; whether the information originated in the United States; the availability of alternative means of securing the information; and the extent to which noncompliance with the request would undermine important interests of the United States, or compliance with the request would undermine important interests of the state where the information is located.

Restatement § 442(1)(c).

As to the first factor, there is no doubt that these documents are important to Plaintiffs, or that providing a remedy for victims of terrorism is of general importance to the United States. But the present proceedings do not relate to the merits of a terrorism claim. They relate instead to

---

[14] These cases applied an earlier version of the Restatement, but the guiding principles are similar. *See Reinsurance Co. of Am.*, 902 F.2d at 1280 (applying Restatement (Second) of Foreign Relations Law of the United States but observing that the factors to be considered under second and third Restatements are "largely synonymous").

the peripheral issue of post-judgment discovery. *See Reinsurance Co. of Am.*, 902 F.2d at 1280 (plaintiff's interests were less compelling where "[t]he disputed materials [we]re the subject of a post-judgment interrogatory request and not vital to the case-in-chief"). The Court must also consider that the discovery is directed to a third-party bank, which is not alleged to have engaged in an act of terrorism, rather than a terrorist organization. *Tiffany (NJ) LLC v. Qi Andrew*, 276 F.R.D. 143, 157 (S.D.N.Y. 2011) ("[T]he Banks' status as non-parties does attenuate the United States interest in enforcing discovery obligations[.]"). The first factor weighs in favor of Plaintiffs, but not overwhelmingly.

As to the second and third factors, the requests are specific as to the types of information sought, but very broad as to where the information might be located. The banks have submitted evidence that they have hundreds or thousands of offices in various countries around the world, and that it would be highly burdensome for them to search for responsive documents that might be located at any one of them. (R. 136, Cunningham Decl. ¶¶ 8-11; R. 152, Christie Decl. ¶ 5.) The banks have also submitted evidence that no responsive information is located in this forum, and Plaintiffs acknowledge that at this point the discovery dispute is over "Iranian bank accounts maintained by the Bank[s] in [their] overseas branches." (R. 165, Pls.' Opp'n at 1). It is unlikely that records pertaining to bank accounts held or opened outside of the United States would have "originated" in the United States, and Plaintiffs do not argue otherwise. Plaintiffs suggest that the Chicago branches should be able to obtain these foreign documents if they tried hard enough, but this does not answer the question of where the documents originated. As another Judge in this District observed: "The jurisdiction of American courts is unquestioned when they order their own nationals to produce documents located within this country," but a court is on far shakier ground when it "order[s] a party or non-party to produce documents located abroad, especially

31

when the country in which the documents are situated prohibits their disclosure." *Dexia Credit Local v. Rogan*, 231 F.R.D. 538, 541 (N.D. Ill. 2004) (citation and internal alteration omitted). The second and third factors weigh in favor of the banks.

As to the fourth factor, the record shows that Plaintiffs do have alternative means available for obtaining discovery in aid of their judgment. As to Paribas, Plaintiffs can use Hague Convention discovery procedures, which are outlined in the note following 28 U.S.C. § 1781, to gain information from the bank's headquarters. (*See* R. 151, Paribas' Mem. at 17-21 (outlining procedures).) Japan is not a signatory to the Hague Convention, but Plaintiffs can use the Japanese Civil Execution Act and the Japanese Code of Civil Procedure to obtain discovery at Bank of Tokyo's headquarters to aid in the execution of their judgment. (R. 137, Inoshita Decl. ¶¶ 12-17.) Plaintiffs would clearly prefer to proceed with their execution efforts in Illinois (although given the location of their attorneys and other practical considerations it is not entirely clear to the Court why this is the case), but they have not demonstrated that these other means would be ineffectual. As Justice Ginsburg has noted, there is little legal basis for a court in the United States to "become a 'clearinghouse for information' about any and all property held by [a foreign state] abroad." *NML Capital*, 134 S. Ct. at 2259 (Ginsburg, J., dissenting). The Court finds that this factor weighs in favor of the banks.

As to the fifth factor, the banks have provided evidence that turning over the records requested by Plaintiffs could subject them to civil liability or even criminal sanctions in the jurisdictions where they are headquartered. The heavy penalties that apply reflect that these countries attach great significance to the non-disclosure of this information.[15] *See Reinsurance*

---

[15] Under the Restatement, the Court has discretion to require the party contesting discovery to make a good faith effort to obtain the approval of the foreign state to release the documents. *See* Restatement § 442(2)(a); *Reinsurance Co. of Am.*, 902 F.2d at 1282-83. The Court does not find it appropriate to require this step here, given that it is highly questionable whether the Court has personal jurisdiction over the banks.

*Co. of Am.*, 902 F.2d at 1280 (the fact that foreign state imposed strict penalties for release of information showed that foreign state "places a high price on this secrecy"); *Activision*, 86 A.3d at 550 (observing that the French Data Protection Act "codifies a data privacy regime established by the European Union, which considers the privacy of personal data to be part of the fundamental rights and freedoms of natural persons" (citation and internal quotation marks omitted)).

While the United States does have a general interest in providing post-judgment remedies to enforce a judgment obtained here, declining to permit discovery in this District would not leave Plaintiffs without options for executing their judgment. In addition to the foreign discovery procedures outlined above, Plaintiffs can also seek to attach Defendants' assets located in the United States that have been blocked pursuant to TRIA.[16] *See Stansell v. Revolutionary Armed Forces of Colombia*, --- F. Supp. 3d ---, 2015 WL 8731783, at \*4 (M.D. Fla. July, 22, 2015) (refusing to permit terrorist victims to garnish bank accounts of terrorist party located outside of Florida but noting that victims could still seek blocked assets under TRIA to satisfy their judgment); *see also Rubin v. Islamic Republic of Iran*, 33 F. Supp. 3d 1003, 1014-15 (N.D. Ill. 2014) (describing attachment of Iranian blocked assets under TRIA).

Carefully considering all of the relevant factors, the Court finds that interests of international comity weigh against ordering these foreign non-party banks to comply with

---

[16] TRIA provides: "Notwithstanding any other provision of law . . . in every case in which a person has obtained a judgment against a terrorist party on a claim based upon an act of terrorism . . . the blocked assets of that terrorist party (including the blocked assets of any agency or instrumentality of that terrorist party) shall be subject to execution or attachment in aid of execution in order to satisfy such judgment to the extent of any compensatory damages for which such terrorist party has been adjudged liable." TRIA § 201(a) (codified at 28 U.S.C. § 1610 note). The U.S. Department of the Treasury, Office of Foreign Asset Control provides an annual report of the blocked and non-blocked assets of Iran located within the United States. *See* U.S. Dep't of Treasury, *Terrorist Assets Report* (*available at* https://www.treasury.gov/resource-center/sanctions/Programs/Documents/tar2014.pdf).

Plaintiffs' broad discovery requests.[17] *Reinsurance Co. of Am.*, 902 F.2d at 1281-82 (applying

Restatement and concluding that Romania's interest in protecting information justified decision

not to compel Romanian company to answer interrogatories); *First Nat'l Bank of Chi.*, 699 F.2d

at 345-47 (considering Restatement factors and concluding that district court abused its

discretion in ordering disclosure of documents pursuant to subpoena by a Greek bank, where

bank employees who faced potential criminal liability for disclosure of client information located

in Greece were "involved only as neutral sources of information and not as . . . adverse parties in

litigation"); *Tiffany*, 276 F.R.D. at 160 (considering Restatement factors and declining to order

production of documents located in China from non-party banks despite their importance to the

litigation, where disclosing the documents could expose the banks to civil or criminal liability

under Chinese law, and plaintiffs could seek the documents in China through Hague Convention

discovery procedures).

In closing, the Court is cognizant of the horrific injuries suffered by Plaintiffs at the

hands of terrorists supported by the Iranian government. The Court also understands Plaintiffs'

desire to obtain their multi-million dollar judgment, as well as the practical difficulties faced by

terrorist victims seeking to enforce their judgments against Iran. But the Court cannot jettison the

requirements of due process or important principles of international comity to permit the

---

[17] Because of the Court's ruling on the threshold issues of personal jurisdiction and international comity, the Court does not reach the banks' alterative arguments regarding the proper scope of Rule 45 and Rule 30(b)(6), the "separate entity rule," or the extraterritorial reach of the statutes at issue in this case. (*See* R. 167, Banks' Mem. at 18-21.)

expansive third-party discovery sought by Plaintiffs in this case. For these reasons, the Court declines to compel compliance with the citations or subpoenas issued to these non-party banks.[18]

## CONCLUSION

For the foregoing reasons, the banks' motions to quash (R. 133, 139, 149) are GRANTED. Plaintiffs' motions to compel (R. 154, 158) are DENIED.

ENTERED:

**Chief Judge Rubén Castillo**
**United States District Court**

**Dated: May 19, 2016**

---

[18] Plaintiffs make a general request for jurisdictional discovery without outlining why it is needed or what limited discovery requests they would make. (*See* R. 159, Pls.' Mem. at 13; R. 170, Pls.' Reply at 9.) Instead, Plaintiffs appear to request that full compliance with their discovery requests be ordered and that the documents be turned over "*in camera* or subject to a confidentiality agreement," and a Rule 30(b)(6) deposition conducted, so that the Court can determine from the information revealed whether jurisdiction exists. (R. 159, Pls.' Mem. at 13.) This argument is rather circular, as the threshold question is whether the Court has authority to require compliance with the discovery requests at all; the case law is clear that Plaintiffs must make a *prima facie* showing of personal jurisdiction before such discovery should be permitted. *Cent. States, Se. & Sw. Areas Pension Fund v. Reimer Express World Corp.*, 230 F.3d 934, 946 (7th Cir. 2000). This is particularly true when a foreign party is involved: "Foreign nationals usually should not be subjected to extensive discovery in order to determine whether personal jurisdiction over them exists." *Id.* Given that Plaintiffs have not made a *prima facie* showing of personal jurisdiction or outlined what limited information they would need to make such a showing, the Court declines to require the banks to submit to jurisdictional discovery. *See id.* at 947 ("[B]urdensome, wide-ranging discovery against defendants from a foreign nation is not appropriate at a stage where the district court is trying to determine whether it has any power over [them]."); *Siswanto v. Arbus*, --- F. Supp. 3d ---, 2015 WL 9489952, at *7 (N.D. Ill. Dec. 30, 2015) (denying plaintiffs' request to obtain jurisdictional discovery from foreign corporation where "Plaintiffs failed to make a prima facie showing of personal jurisdiction, let alone proffer what limited discovery requests they would issue").