SHLOMO LEIBOVITCH, *et al.*,    )
    )
    Plaintiffs,    )
    )    **No. 08 C 1939**
    v.    )
    )    **Chief Judge Rubén Castillo**
ISLAMIC REPUBLIC OF IRAN, *et al.*,    )
    )
    Defendants.    )

## MEMORANDUM OPINION AND ORDER

In this long-running case, Shlomo Leibovitch and several of his family members

("Plaintiffs") seek to recover for injuries they suffered as a result of an act of terrorism

committed with the support of the Islamic Republic of Iran and the Iranian Ministry of

Information ("Defendants"). Presently before the Court is Plaintiffs' motion to compel discovery

from non-party The Boeing Company ("Boeing"), as well as Boeing's cross-motion to quash

Plaintiffs' discovery requests.[1] (R. 232, Pls.' Mot.; R. 245, Boeing's Mot.) For the reasons stated

below, Plaintiffs' motion to compel is granted in part and denied in part, and Boeing's cross-

motion is denied.

## BACKGROUND

The facts of this case have been fully set forth in several prior opinions of this Court and

the U.S. Court of Appeals for the Seventh Circuit. *See Leibovitch v. Islamic Republic of Iran,*

---

[1] With the Court's permission, a number of documents related to the present dispute have been filed under seal. (*See* R. 246, Order; R. 251, Min. Entry.) Although Boeing submitted a number of supporting declarations under seal, (*see* R. 247), it referenced and quoted from those sealed declarations in its publicly filed memorandum. (*See, e.g.,* R. 245-1, Boeing's Mem. at 7 (citing R. 247-1, Larson Decl.); *id.* at 8 (citing R. 247-2, Bentrott Decl.).) Where that occurred, the Court has referenced the information contained in the declarations. Additionally, Plaintiffs filed their entire reply brief under seal without submitting a public, redacted version as required by the Local Rules. *See* N.D. ILL. L.R. 26.2. Much of the material contained in Plaintiffs' reply brief is not sensitive or has already been disclosed in other publicly filed documents. Throughout this opinion, the Court has taken pains to keep sensitive information out of the public record while also bearing in mind that "[w]hat happens in the halls of government is presumptively open to public scrutiny." *In Re Matter of Krynicki,* 983 F.2d 74, 75 (7th Cir. 1992).

852 F.3d 687 (7th Cir. 2017); *Leibovitch v. Islamic Republic of Iran*, 697 F.3d 561 (7th Cir. 2012); *Leibovitch v. Islamic Republic of Iran*, 188 F. Supp. 3d 734 (N.D. Ill. 2016); *Leibovitch v. Syrian Arab Republic*, 25 F. Supp. 3d 1071 (N.D. Ill. 2014). In brief, the tragic facts underlying the case began in 2003, when the Leibovitch family was driving on a highway in Jerusalem and their minivan "was shot up by members of Palestine Islamic Jihad, a terrorist group supported by the government of Iran." *Leibovitch*, 852 F.3d at 688-89. Seven-year-old Noam Leibovitch was killed and her three-year-old sister Shira Leibovitch (an American citizen) was permanently injured. *Id.* The surviving family members, as well as Noam's estate, filed this action for damages against Defendants pursuant to the Antiterrorism Act ("ATA"), 18 U.S.C. § 2333, and the state-sponsored terrorism exception to the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1605A. *Id.* at 689. Defendants were served through diplomatic channels in Tehran but never answered or otherwise appeared. *Leibovitch*, 188 F. Supp. 3d at 741, 753. After "protracted proceedings" in both the district and appellate courts, the Court entered a default judgment of $67 million against Defendants. *Leibovitch*, 852 F.3d at 689.

Since that time, Plaintiffs have been engaged in the arduous task of trying to collect on their judgment. *See id.* at 689-90. To that end, in December 2016 they served Boeing, a corporation headquartered in Chicago, with a citation to discover assets pursuant to Federal Rule of Civil Procedure 69 and 735 ILL. COMP. STAT. 5/2-1402, as well as discovery requests under Rule 45 seeking to identify Iranian assets "which are or may be held by Boeing." (R. 233, Pls.' Mem. at 2.) Specifically, Plaintiffs seek information about a contract—which has been widely reported in the media—between Boeing and the Airline of the Islamic Republic of Iran ("Iran Air"), under which Boeing is to provide Iran Air with 80 commercial airplanes worth approximately $16 billion over a period of years. (*See, e.g.*, R. 234-7, News Article.) This deal

was made possible by the Joint Comprehensive Plan of Action ("JCPOA"), commonly referred to as the "Iran Nuclear Deal," which was brokered in July 2015 among the E3/EU+3 nations[2] and Iran. (R. 245-3, Iran Nuclear Deal at 4.) The goal of the Iran Nuclear Deal was to ensure that Iran's nuclear program is "exclusively peaceful." (*Id.*) As part of the deal, the United States (through former President Barack Obama) agreed to lift various commercial sanctions against Iran and to "allow for the sale of commercial passenger aircraft and related parts and services to Iran[.]" (*Id.* at 13.) Consistent with this obligation, in September 2016 the U.S. Office of Foreign Asset Control ("OFAC") licensed Boeing's future sale of commercial airplanes to Iran Air. (R. 245-1, Boeing's Mem. at 7; R. 247-1, Larson Decl. ¶ 12.) Boeing thereafter entered into an agreement with Iran Air, dated December 11, 2016, to sell 80 commercial airplanes to Iran Air. (R. 245-1, Boeing's Mem. at 8; R. 247-1, Larson Decl. ¶¶ 2-3.) This deal was the first major commercial transaction between American and Iranian companies in four decades. (R. 245-1, Boeing's Mem. at 8; R. 247-2, Bentrott Decl. ¶ 6.)

The present motions stem from Plaintiffs' efforts to learn the details of the airplane deal. Plaintiffs seek "information about assets of the judgment debtors against which they can enforce their judgments, either in the United States or elsewhere." (R. 233, Pls.' Mem. at 4-5.) Their Rule 45 document subpoena contains eight separate document requests. They ask for a copy of the contract itself, as well as all "ancillary documents . . . that would identify[] the parties and their obligations as well as documents concerning the financial institutions involved in the transaction, the financing arrangements, [and the manner of] payment and delivery." (*Id.* at 5; *see also* R. 234-3, Doc. Subpoena.) Plaintiffs further request "all correspondence, notices, written inquiries, letters, or writings of any nature . . . between Boeing, Iran Air and/or the Islamic

[2] The E3/EU+3 nations are China, France, Germany, the Russian Federation, the United Kingdom, and the United States, along with the High Representative of the European Union for Foreign Affairs and Security Policy. (R. 245-3, Iran Nuclear Deal at 4.)

Republic of Iran, in respect to the Contract and the parties' respective obligations and payments under the Contract." (R. 243-4, Doc. Subpoena ¶ 6.) They also seek production of "[a]ny and all correspondence" between Boeing and OFAC, or any other department or agency of the U.S. government, "relating to assets or property of the Islamic Republic of Iran, including without limitation the Contract." (*Id.* ¶ 7.) Plaintiffs also served Boeing with a Rule 45 deposition subpoena, requiring Boeing to designate a corporate representative pursuant to Rule 30(b)(6) to testify on a variety of matters, including the details of the contract and the details of any communications between Boeing and Iran Air, or Boeing and the U.S. government, broadly relating to the contract or any asset of Iran. (R. 234-4, Dep. Subpoena ¶¶ 1-7.)

In response, Boeing has not produced any documents or designated a corporate representative pursuant to Rule 30(b)(6).[3] Instead, Boeing moves to quash the subpoenas and dismiss the citation in its entirety. (R. 245, Boeing's Mot.) In Boeing's view, ordering the requested relief would require the Court to resolve "nonjusticiable political questions" and violate principles of international comity; Boeing believes that granting these discovery requests would cause "significant harm to the goals of the United States and its European allies" and "risk destabilizing the purpose of the JCPOA to provide for regional and international peace and security." (R. 245-1, Boeing's Mem. at 12-13 (internal quotation marks omitted)). Boeing also argues that Plaintiffs' discovery requests "seek irrelevant information and are disproportionate to the needs of the case," because the contract, as currently drafted, will not result in any Iranian assets being subject to attachment in the United States. (*Id.* at 16-17.)

Plaintiffs argue in reply that their discovery requests do not raise any non-justiciable political questions or trigger international comity concerns. (R. 252, Pls.' Reply at 2-6.) In their

---

[3] Boeing has provided certain basic information about the contract in a declaration filed under seal by one of its directors. (*See* R. 247-1, Larson Decl.)

view, Boeing is essentially asking this Court "to afford Iran and Iran Air, and by extension their business partner Boeing, protections and immunities that are not mentioned in either [the Iran Nuclear Deal] or the [FSIA]." (*Id.* at 3.) Plaintiffs believe that the Iran Nuclear Deal "did nothing to prohibit the victims of terror from continuing to exercise their rights under the FSIA." (*Id.* at 5.) In response to Boeing's relevancy and proportionately argument, Plaintiffs argue that Boeing has skewed the inquiry by suggesting that Plaintiffs must demonstrate that they are able to execute on specific assets before they are permitted any discovery related to those assets. (*Id.* at 8-9.)

After reviewing the parties' submissions, the Court found it prudent to obtain a statement from the U.S. government as to whether, in its view, "permitting the discovery sought by Plaintiffs will, as Boeing argues, interfere with U.S. foreign policy toward Iran by obstructing a key component of the international nuclear deal." (R. 258, Min. Entry (citation and internal quotation marks omitted).) The government, through the U.S. Department of Justice on behalf of the Executive Branch, has now filed a statement of interest, and represents that "the United States does not take a position on whether the Court should order the requested discovery." (R. 265, Gov't's Statement at 3.) According to the statement, the United States is "implementing its JCPOA commitments," and "those commitments do not require the Executive Branch to take any specific action with respect to efforts by judgment creditors of Iran to pursue post-judgment discovery or other enforcement proceedings."[4] (*Id.*) The government urges only that if discovery is ordered, the Court "supervise such discovery carefully, taking into account the sensitive nature

---

[4] The government's statement makes no mention of the fact that in October 2017, President Trump announced that he "cannot and will not make [the] certification," as required by the Iran Nuclear Agreement Review Act, 42 U.S.C. § 2160e, that "suspension of sanctions under the deal is appropriate and proportionate to . . . measures taken by Iran to terminate its illicit nuclear program." *See* Press Release, Remarks by President Donald J. Trump on Iran Strategy (Oct. 13, 2017), *available at* https://www.whitehouse.gov/briefings-statements/remarks-president-trump-iran-strategy. The parties' briefs were filed before this announcement was made, and so they have not weighed in on the matter either. Without guidance from the government or the parties, this Court declines to speculate how this pronouncement might impact the airplane deal.

of discovery into the property of foreign states and their agencies and instrumentalities."[5] (*Id.* at 4.)

## ANALYSIS

"[F]oreign sovereign immunity is a matter of grace and comity on the part of the United States." *Rubin v. Islamic Republic of Iran*, No. 16-534, 2018 WL 987348, at *4 (U.S. Feb. 21, 2018) (citation omitted). For much of our nation's history, courts "deferred to the decisions of the political branches" regarding whether immunity applied in a given situation. *Id.* (citation omitted). In the 1970s, "Congress enacted the FSIA in an effort to codify th[e] careful balance between respecting the immunity historically afforded to foreign sovereigns and holding them accountable, in certain circumstances, for their actions." *Id.* One such exception to foreign sovereign immunity is Section 1605A of the FSIA, under which "American nationals may file suit against state sponsors of terrorism in the courts of the United States."[6] *Bank Markazi v. Peterson*, 136 S. Ct. 1310, 1317 (2016). Specifically, terror victims can seek money damages against a foreign state for personal injury or death caused by an act of terrorism, including "torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support" to terrorist activities. *Id.* (quoting 28 U.S.C. § 1605A(a)(1)).

Yet terror victims who prevail under the FSIA "have often faced practical and legal difficulties at the enforcement stage." *Id.* at 1317-18 (citation omitted). Several legal principles limit the ability of a prevailing plaintiff from attaching assets of a foreign state. *Id.* at 1318. Subject to a few narrow exceptions, "the FSIA shields foreign-state property from execution."

---

[5] The government further states that it "will continue to monitor this proceeding and if necessary may file a further Statement of Interest at a later stage." (R. 265, Gov't's Statement at 6.)

[6] The statute leaves to the Executive Branch to determine which countries should be designated as a "state sponsor of terrorism." 28 U.S.C. § 1605A(h)(6). At present, only four countries are so designated: North Korea, Iran, Syria, and Sudan. 31 C.F.R. § 596.201; *see also* Dep't of State, *State Sponsors of Terrorism, available at* https://www.state.gov/j/ct/list/c14151.htm (last visited Feb. 26, 2018).

*Id.*; *see also Rubin*, 2018 WL 987348, at *5 (observing that the FSIA "provides as a default that the property in the United States of a foreign state shall be immune from attachment arrest and execution" (citation and internal quotation marks omitted)). Courts in the United States also "generally lack authority . . . to execute against property in other countries[.]" *Republic of Argentina v. NML Capital, Ltd.*, 134 S. Ct. 2250, 2257 (2014). But other foreign-state property is potentially available to plaintiffs who obtain a judgment under the FSIA. *Bank Markazi*, 136 S. Ct. at 1318. Attachable assets include "foreign-state property located in the United States" that is "used for a commercial activity." *Id.* (citation omitted). Additionally, the Terrorism Risk Insurance Act of 2002 ("TRIA") authorizes execution of judgments obtained under the FSIA's state-sponsored terrorism exception against "the blocked assets" of a terrorist party, its agencies, or its instrumentalities. *Id.* A "blocked asset" is defined as "any asset seized by the Executive Branch pursuant to either the Trading with the Enemy Act (TWEA), or the International Emergency Economic Powers Act (IEEPA)." *Id.* (citations omitted).

The FSIA does not specifically address what post-judgment discovery procedures are available to plaintiffs seeking execution of a judgment obtained against a foreign state. *NML Capital*, 134 S. Ct. at 2256 ("There is no . . . provision forbidding or limiting discovery in aid of execution of a foreign-sovereign judgment debtor's assets."). However, the Federal Rules of Civil Procedure apply to such proceedings, and the rules governing post-judgment discovery are "quite permissive." *Id.* at 2254. Specifically, Federal Rule of Civil Procedure 69 provides that "[i]n aid of the judgment or execution," a judgment creditor "may obtain discovery from any person—including the judgment debtor—as provided in these rules or by the procedure of the state where the court is located." Fed. R. Civ. P. 69(a)(2). Plaintiffs here are invoking Federal Rule of Civil Procedure 45, pertaining to third-party discovery, and 735 Ill. Comp. Stat. 5/2-

1402(a), which "enables a judgment creditor to discover assets or income of the debtor[.]" *Shales v. T. Manning Concrete, Inc.*, 847 F. Supp. 2d 1102, 1111 (N.D. Ill. Mar. 13, 2012) (citation and internal quotation marks omitted); *see also* 735 ILL. COMP. STAT. 5/2-1402(a) (providing that "[a] judgment creditor . . . is entitled to prosecute supplementary proceedings for the purposes of examining the judgment debtor or any other person to discover assets or income of the debtor not exempt from the enforcement of the judgment"). A citation served under the Illinois statute can also be used to compel "the application of non-exempt assets or income" of the debtor in the hands of a third party to be paid toward the judgment. 735 ILL. COMP. STAT. 5/2-1402(a). Service of a citation has the effect of creating a lien on all "nonexempt personal property, including money, choses in action, and effects of the judgment debtor . . . in the possession or control of the third party[.]" 735 ILL. COMP. STAT. 5/2-1402(m). This "restraining provision" is "intended to forestall the judgment debtor or a third party from frustrating the supplementary proceedings before the judgment creditor has had an opportunity to reach assets." *Shales*, 847 F. Supp. 2d at 1111 (citation, internal quotation marks, and alteration omitted). With this background in mind, the Court turns to Boeing's arguments.

## I.      Political Question Doctrine

Boeing first argues that Plaintiffs' motion to compel should be denied because "enforcing Plaintiffs' [discovery] requests would require the Court to resolve nonjusticiable political questions." (R. 245-1, Boeing's Mem. at 12.) Specifically, Boeing argues that "[i]n committing the United States to the JCPOA, the President (with congressional acquiescence) made a political judgment to undertake certain obligations, including allowing Iran to acquire commercial airplanes from U.S. companies, in exchange for securing a diplomatic solution to the problem posed by Iran's nuclear program." (*Id.*) In Boeing's view, "Plaintiffs . . . seek to use this Court to

substitute their own policy judgments of the President and Congress" by "frustrating a central element of the JCPOA and undermining the finality of the United States' foreign policy choices[.]" *Id.* at 13.

"In general, the Judiciary has a responsibility to decide cases properly before it, even those it would gladly avoid." *Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 194 (2012) (citation omitted). One "narrow exception" to that rule is the "political question doctrine." *Id.* at 195. "The political-question doctrine identifies a class of questions that either are not amenable to judicial resolution because the relevant considerations are beyond the courts' capacity to gather and weigh, . . . or have been committed by the Constitution to the exclusive, unreviewable discretion of the executive and/or legislative—the so-called 'political'—branches of the federal government." *Judge v. Quinn*, 624 F.3d 352, 358 (7th Cir. 2010) (citations and internal quotation marks omitted); *see also Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 230 (1986) ("The political question doctrine excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch."). The doctrine embodies a recognition that "courts are fundamentally underequipped to formulate national policies or develop standards for matters not legal in nature." *Japan Whaling*, 476 U.S. at 230 (citation omitted). The Supreme Court has set forth several factors to guide courts in identifying a political question:

> Prominent on the surface of any case held to involve a political question is found a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of

embarrassment from multifarious pronouncements by various departments on one question.

*Baker v. Carr*, 369 U.S. 186, 217 (1962). A case is not barred by the political question doctrine "[u]nless one of these formulations is inextricable from the case[.]" *Id.*

In general, "matters relating to the conduct of foreign relations . . . are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference." *Haig v. Agee*, 453 U.S. 280, 292 (1981) (citation and internal quotation marks omitted); *see also United States v. Pink*, 315 U.S. 203, 222-23 (1942) ("[T]he conduct of foreign relations is committed by the Constitution to the political departments of the Federal Government; . . . the propriety of the exercise of that power is not open to judicial inquiry[.]"). However, the Court must make a careful inquiry when deciding if the doctrine applies, because there is a distinction between "political questions" and "political *cases*," and not "every case or controversy which touches foreign relations lies beyond judicial cognizance." *Baker*, 369 U.S. at 211, 217 (emphasis added). Put simply, "it is emphatically the province and duty of the judicial department to say what the law is," *Zivotofsky*, 566 U.S. at 196 (citation and internal alteration omitted), and the Court "cannot shirk this responsibility merely because [its] decision may have significant political overtones." *Japan Whaling Ass'n*, 478 U.S. at 230. Because the doctrine is largely driven by separation of powers concerns, the Court must employ additional scrutiny when the doctrine is invoked by a private party rather than a "coordinate branch of the United States government." *McMahon v. Presidential Airways, Inc.*, 502 F.3d 1331, 1359-60 (11th Cir. 2007).

In considering these principles, the Court agrees with Plaintiffs that Boeing's reliance on the political question doctrine is misplaced. This Court is being called to decide a discovery dispute, plain and simple. Although the discovery sought certainly has "political overtones,"

*Japan Whaling Ass'n*, 478 U.S. at 230, the Court is not deciding any issue at this juncture that is committed to some other branch of the government or for which there are no judicially manageable standards for resolving.[7] *Compare Zivotofsky*, 566 U.S. at 194-96 (concluding that action by parents seeking permanent injunction requiring Secretary of State to identify child's place of birth as "Jerusalem, Israel" was not barred under political question doctrine, even though the Executive Branch has the sole power to determine the political status of Jerusalem) *and Japan Whaling Ass'n*, 476 U.S. at 230 (concluding that political question doctrine did not bar judicial resolution of controversy over whether federal statute required Executive Branch to make certification in accordance with international treaty) *with Bentzlin v. Hughes Aircraft Co.*, 833 F. Supp. 1486, 1497 (C.D. Cal. 1993) (case presented a political question where resolving plaintiff's claims would "necessarily require inquiry into military strategy").

To the contrary, there are applicable rules and cases addressing the circumstances under which post-judgment discovery may be granted, even when that discovery implicates the interests of a foreign state. *See* FED. R. CIV. P. 26, 30, and 69; *NML Capital*, 134 S. Ct. at 2256 ("There is no [ ] provision forbidding or limiting discovery in aid of execution of a foreign-sovereign judgment debtor's assets."). Nothing decided in this case will demonstrate a lack of respect for a coordinate branch of government, nor is there any potential for "multifarious

---

[7] In its briefs, Boeing relies heavily on *Spectrum Stores, Inc. v. Citgo Petroleum Corp.*, 632 F.3d 938, 951 (5th Cir. 2011), to argue that this case presents a non-justiciable political question. (*See* R. 245-1, Boeing's Mem. at 13-14; R. 253, Boeing's Reply at 9.) The Court finds that case distinguishable. *Spectrum* was a class action alleging antitrust violations against various oil production companies, most of whom were member nations of the Organization of Petroleum Exporting Countries ("OPEC"). *Id.* at 942-43. In their complaint, the plaintiffs "effectively challenge[d] the structure of OPEC and its relation to the worldwide production of petroleum." *Id.* at 943. The *Spectrum* court observed the district court was "asked essentially to reprimand foreign nations and command them to dismantle their international agreements," which it found wholly inappropriate under the political question and act of state doctrines. *Id.* at 943, 951. Plaintiffs here are not challenging the structure of the JCPOA, nor is this Court being called to reprimand a foreign nation or command another nation to dismantle an international agreement. The Court is merely deciding whether Plaintiffs should be permitted to conduct post-judgment discovery into a commercial transaction between an American company and an Iranian company affiliated with the Iranian government. As the *Spectrum* court itself noted, "it cannot of course be thought that every case or controversy which touches foreign relations lies beyond judicial cognizance." *Id.* at 950 (citation and internal quotation marks omitted).

pronouncements" by different branches of government on the same question. *Baker*, 369 U.S. at

217. Notably, the Court proactively sought the input of the Executive Branch, and it has declined

to raise any objection to the discovery requests on grounds of the political question doctrine or

similar reason.[8] (*See* R. 265, Gov't's Statement.)

The Court must also consider that Plaintiffs are trying to collect on a valid judgment

obtained under FSIA, a statute enacted by another coordinate branch of government—

Congress—to provide a mechanism for terrorism victims to recover from foreign states. *See*

*Flatow v. Islamic Rep. of Iran*, 999 F. Supp. 1, 25 (D.D.C. 1998) ("The state-sponsored terrorism

exception . . . was enacted explicitly . . . to alter the conduct of foreign states. . . [The author of

the bill] was convinced that the only way to accomplish this goal was to impose massive civil

liability on foreign state sponsors of terrorism[.]"), *abrogated on other grounds as recognized in*

*Haim v. Islamic Republic of Iran*, 425 F. Supp. 2d 56, 71 n. 2 (D.D.C. 2006). By its very nature,

litigation against a foreign state under the FSIA certainly has significant political overtones. But

the present dispute does not require the Court to consider the wisdom of the FSIA or the Iran

Nuclear Deal,[9] nor is there any conflict between the two for the Court to resolve. In the view of

the Executive Branch, the Iran Nuclear Deal does not expressly address the rights of creditors

---

[8] Courts attach significance to the government's own view of whether a case raises a non-justiciable political question. *See McMahon*, 502 F.3d at 1365 ("The apparent lack of interest from the United States to this point fortifies our conclusion that the case does not yet present a political question."); *Occidental of Umm al Qaywayn, Inc. v. A Certain Cargo of Petroleum Laden Aboard the Tanker Dauntless Colocotronis*, 577 F.2d 1196, 1204 n.14 (5th Cir. 1978) (observing that "whether the state department believes that judicial action would interfere with its foreign relations is germane" to the court's determination of whether a case presents a political question).

[9] Boeing makes a significant effort to impugn the motives of Plaintiffs' attorneys, suggesting that their purpose in pursuing these discovery requests is to derail the Iran Nuclear Deal for political reasons. (*See, e.g.*, R. 245-1, Boeing's Mem. at 13-15; R. 245-6, Shurat HaDin Press Release; R. 245-7, Letter to Boeing Chairman; R. 245-8, *Times of Israel* Article.) The Court is unpersuaded by this argument. If Plaintiffs are entitled to the discovery they seek, the subjective motivations of their counsel are irrelevant. Additionally, by signing the discovery requests, Plaintiffs' lead counsel implicitly certified that the requests were not made "for any improper purpose," such as to "harass" or "cause unnecessary delay." FED. R. CIV. P. 26(g). The Court has no reason to doubt that counsel is complying with his obligations as a member of the bar. The Court must consider additionally that although Boeing purports to be advocating in support of such goals as international comity and respect among coordinate branches of government, it also has a strong financial motivation for ensuring that the airplane deal is consummated.

holding a judgment against Iran under the FSIA.[10] (*See* R. 265, Gov't's Statement at 5.) In short, although this case certainly "touches foreign relations," *Baker*, 369 U.S. at 217, the Court finds that it does not raise any non-justiciable political question.

## II.     International Comity

Boeing next argues that even if the case does not involve a non-justiciable political question, the Court should nevertheless "abstain" from deciding the discovery motion under principles of international comity. (R. 245-1, Boeing's Mem. at 15.) Boeing's argument on this point is somewhat unclear, but as best as can be discerned, Boeing believes that adjudicating this discovery dispute will "frustrate the purpose" of the Iran Nuclear Deal and offend the other sovereign-nation signatories to the agreement by potentially hindering the airplane deal. (*Id.* at 15-16.)

International comity refers to the "spirit of cooperation in which a domestic tribunal approaches the resolution of cases touching the laws and interests of other sovereign states." *See Société Nationale Industrielle Aérospatiale v. U.S. Dist. Ct. for S. Dist. of Iowa*, 482 U.S. 522, 543 n.27 (1987). "[I]t is the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens or of other persons who are under the protection of its laws." *Id.* (citation omitted). International comity principles require that "American courts . . . demonstrate due respect for any special problem confronted by [a] foreign litigant on account of its nationality or the location of its operations[.]" *Id.* at 546. Additionally, the doctrine "requires the courts of one nation to avoid, where possible, interfering with the

---

[10] Under the Restatement (Third) of Foreign Relations Law, "great weight" is to be given to the Executive Branch's interpretation of an international agreement. Restatement (Third) of Foreign Relations Law § 326 (1987).

courts of another." *H-D Mich., LLC v. Hellenic Duty Free Shops S.A.*, 694 F.3d 827, 848 (7th Cir. 2012).

The Court agrees with Plaintiff that international comity principles do not warrant abstention in this case. In resolving this dispute, the Court will be applying well-settled American law governing discovery disputes, not the law of some other nation. *See Volodarskiy v. Delta Airlines, Inc.*, 784 F.3d 349, 356 (7th Cir. 2015) (observing that "asking a U.S. court to wade into an area of [European] law that is fraught with uncertainty risks offending principles of international comity"). Nor is the Court interfering in any way in an ongoing proceeding in a foreign court. *See H-D Mich., LLC*, 694 F.3d at 848; *see also Volodarskiy v. Delta Air Lines, Inc.*, 987 F. Supp. 2d 784, 795 (N.D. Ill. 2013) ("Comity concerns are particularly relevant when there are parallel proceedings in domestic and foreign courts."). If the discovery requests are granted, Boeing would be the only party subject to the Court's order, and Boeing is not a foreign litigant, let alone a foreign sovereign. Instead, Boeing is an American corporation headquartered within the territorial jurisdiction of this Court. Boeing has not argued that the documents sought are located abroad, or that producing them would cause Boeing to violate the laws of some foreign state. These are the usual concerns that would trigger abstention in a discovery dispute, and none of them are present in this case.[11] *See, e.g., Reinsurance Co. of Am. v. Adminstratia Asigurarilor de Stat*, 902 F.2d 1275, 1281-83 (7th Cir. 1990) (concluding that district court properly declined to order Romanian company to produce information that was protected by Romanian law under international comity principles); *Republic Techs. (NA), LLC v. BBK*

---

[11] It also must be recognized that Plaintiffs are trying to collect a valid judgment they obtained under the FSIA, a statute that itself "embodies basic principles of international law long followed both in the United States and elsewhere." *Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l Drilling Co.*, 137 S. Ct. 1312, 1319 (2017); *see also NML Capital*, 134 S. Ct. at 2258 (rejecting argument that international comity concerns precluded court from requiring foreign sovereign to submit to post-judgment discovery, since the FSIA contained no such limitation).

*Tobacco & Foods, LLP*, No. 16 C 3401, 2017 WL 4287205, at *1 (N.D. Ill. Sept. 27, 2017) (observing that a "potential conflict with French law" required the court to consider principles of international comity before compelling production of documents located in France).

Assuming the Court must conduct any further inquiry under these circumstances, it would look to the Restatement (Third) of Foreign Relations Law ("Restatement"), which provides the following factors for a court to consider in deciding whether to order discovery that implicates international concerns:

> [T]he importance to the investigation or litigation of the documents or other information requested; the degree of specificity of the request; whether the information originated in the United States; the availability of alternative means of securing the information; and the extent to which noncompliance with the request would undermine important interests of the United States, or compliance with the request would undermine important interests of the state where the information is located.

Restatement § 442(1)(c); *see also Aerospatiale*, 482 U.S. at 544 n.28 (considering Restatement factors); *Reinsurance Co. of Am.*, 902 F.2d at 1281-82 (same); *Republic Techs.*, 2017 WL 4287205, at *4 (same).

These factors weigh against abstention.[12] There is no doubt that the documents at issue are important to Plaintiffs, as they present a rare opportunity to gain information about a commercial deal between an American company and an Iranian entity that could potentially lead to executable assets. There is also no doubt that the United States has an interest in providing a post-judgment remedy for victims of terrorism, like Plaintiffs, holding a valid judgment obtained under the FSIA. The request for information is specific, and any concerns about overbreadth can

---

[12] The Court is not persuaded by Boeing's reliance on a prior opinion issued in this case addressing a different discovery dispute. (*See* R. 245-1, Boeing's Mem. at 16; R. 253, Boeing's Reply at 12.) International comity was of great concern there because the subpoenas were directed at foreign banks—over whom the Court lacked personal jurisdiction—and sought documents that were located abroad, the disclosure of which would have caused the banks to violate the confidentiality laws of their home countries. *See Leibovitch v. Islamic Republic of Iran*, 188 F. Supp. 3d 734, 758 (N.D. Ill. 2016), *aff'd*, 852 F.3d 687 (7th Cir. 2017). None of these concerns are present here.

be addressed by the Court in tailoring the order. There is nothing to suggest that Plaintiffs have some other remedy available outside the United States to obtain this information, which seems unlikely given that Boeing is an American corporation and the other party to the contract, Iran Air, is an instrumentality of a country with no formal diplomatic ties to the United States. The Court also considers that the government has filed a statement of interest in this case and, although it urges caution, it has not identified any international comity concerns that would warrant abstention. (*See* R. 265, Gov't's Statement at 5-6.) Under these circumstances, the Court declines to abstain from deciding Plaintiffs' discovery motions on grounds of international comity.

## III.    Relevance and Proportionality

Boeing next argues that the discovery requests should be quashed in their entirety because they are "irrelevant to [Plaintiffs'] efforts to satisfy their judgment and disproportionate to the needs of the case." (R. 245-1, Boeing's Mem. at 16.) Without revealing too much about the contract, Boeing believes the discovery requests are improper—or at least premature— because at present it is unclear if the contract will result in any Iranian assets being located in the United States (or some other jurisdiction) where they would be subject to attachment by Plaintiffs. (R. 245-1, Boeing's Mem. at 16-17.) In support, Boeing provides extensive documentation describing the legal difficulties posed by attaching the assets of Iran, particularly an airplane as it travels in international airspace. (*See, e.g.*, R. 247-3, Affaki Decl.; R. 247-5, Hess Decl.; R. 247-7, Layton Decl.; R. 247-9, Stephan Decl.) At bottom, Boeing's argument appears to be that, because it will be difficult or impossible for Plaintiffs to actually collect any money as a result of these discovery requests, the Court should simply deny them as futile.

Boeing misunderstands the nature of this proceeding. It is true that there are limitations on attaching the property of a foreign state. *See Rubin*, 2018 WL 987348, at *5; *Bank Markazi*, 136 S. Ct. at 1318. But Plaintiffs are not actually *attaching* any assets at present; they are only seeking to discover information about potential assets of Iran that *may be* attachable. In *NML Capital*, the defendant, Argentina, raised an argument similar to Boeing's that "if a judgment creditor could not ultimately execute a judgment against certain property, then it has no business pursuing discovery of information pertaining to that property." 134 S. Ct. at 2257. The Supreme Court expressly rejected this argument, explaining as follows:

> [T]he reason for these subpoenas is that NML *does not yet know* what property Argentina has and where it is, let alone whether it is executable under the relevant jurisdiction's law. If, bizarrely, NML's subpoenas had sought only information that could not lead to executable assets in the United States or abroad, then Argentina likely would be correct to say that the subpoenas were unenforceable— *not* because information about nonexecutable assets enjoys a penumbral discovery immunity under the Act, but because information that could not possibly lead to executable assets is simply not relevant to execution in the first place[.] But of course that is not what the subpoenas seek. They ask for information about Argentina's worldwide assets generally, so that NML can identify where Argentina may be holding property that *is* subject to execution. To be sure, that request is bound to turn up information about property that Argentina regards as immune. But NML may think the same property *not* immune. In which case, Argentina's self-serving legal assertion will not automatically prevail; the District Court will have to settle the matter.

*Id.* at 2257-58 (emphasis in original) (internal citations and quotation marks omitted).

The same reasoning applies here. Plaintiffs should be given the opportunity to obtain information about Iran's "assets generally, so that [they] can identify where [Iran] may be holding property that is subject to execution." *Id.* at 2258. Proceedings to actually attach those assets will come later and, depending on where the assets are located, may not even occur in this

Court.[13] *See Rubin*, 830 F.3d at 475 (observing that to attach property of foreign state, such property "must be within the territorial jurisdiction of the district court"). But Plaintiffs' discovery requests cannot be denied outright simply because Plaintiffs may have difficulty collecting on their judgment at a later stage. In short, the Court is unpersuaded by Boeing's arguments.

## IV.    Citation Proceedings

Boeing also raises a number of objections that are specific to the citation to discover assets. (R. 245-1, Boeing's Mem. at 21-25.) As a preliminary matter, Boeing argues that a citation can only be used to obtain information about assets and income of "the debtor," and neither Boeing nor Iran Air is the "debtor" in this case. (R. 247-1, Boeing's Mem. at 21.) The Court is unpersuaded by this argument. Boeing's own submission suggests that Iran Air has a very direct link to the government of Iran. (*See* R. 247-3, Affaki Decl. ¶ 10.) Thus, its property may be subject to attachment as an "instrumentality" of Iran. *See* 28 U.S.C. § 1610(b) (providing that "any property in the United States of an agency or instrumentality of a foreign state engaged in commercial activity in the United States shall not be immune from attachment in aid of execution" if certain circumstances are met); 28 U.S.C. § 1603(b) (defining "agency or instrumentality" of a foreign state as a separate legal entity, "corporate or otherwise, . . . which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or a political subdivision thereof"); *see also Comet Enter. Ltd. v. Air-A-Plane Corp.*, 128 F.3d 855, 859 (4th Cir. 1997) (noting that Iran Air is "an entity substantially owned or controlled by the Government of Iran"). Again, the Court is not

---

[13] As Plaintiffs point out, the information they seek could lead them to other Iranian assets besides airplanes, and even to other assets besides those directly linked to the contract. (*See* R. 252, Pls.' Reply at 11-12.) For example, the discovery sought could lead Plaintiffs to information about where Iran and/or its instrumentalities conduct banking or hold escrow accounts abroad.

deciding whether Plaintiffs can execute on any particular asset at this stage, but only that Plaintiffs are entitled to conduct discovery reasonably calculated to locating assets that may be subject to attachment. *See NML Capital*, 134 S. Ct. at 2257-58. They have met that standard.

Boeing also argues that the Illinois citation statute cannot be used to restrain property outside of Illinois. (R. 245-1, Boeing's Mem. at 21.) Boeing is correct that there are specific rules regarding what property is subject to attachment under the Illinois statute. A citation generally serves to restrain tangible property of the debtor located within Illinois and intangible property located anywhere, as long as the Illinois court has personal jurisdiction over the owner of the debt. *See Park v. Townson & Alexander, Inc.*, 679 N.E.2d 107, 109 (Ill. App. Ct. 1997); *see also Gates v. Syrian Arab Republic*, No. 11 C 8715, 2013 WL 1337214, at *2-3 (N.D. Ill. Mar. 29, 2013) (observing that under Illinois law, intangible property is generally considered to be "located" in the domicile of its owner). There is an added wrinkle here because under the FSIA, this Court can only restrain assets of a foreign sovereign that are "within [its] territorial jurisdiction." *Rubin*, 830 F.3d at 475. Thus, as a practical matter, the citation could not restrain— for example—real property belonging to Iran that is located in Iran. *See Autotech Techs. LP v. Integral Research & Dev. Corp.*, 499 F.3d 737, 750 (7th Cir. 2007) ("The FSIA did not purport to authorize execution against a foreign sovereign's property, or that of its instrumentality, wherever that property is located around the world.").

But Boeing's concerns are again premature, because at present no assets of Iran have even been identified by Plaintiffs. If and when Plaintiffs do discover such assets, they will have to litigate whether such assets are subject to attachment. The restraining provision of the citation is merely intended to preserve the status quo until the debtor's assets can be discovered. *Shales*, 847 F. Supp. 2d at 1111. Unless and until the Court orders turnover of a particular piece of

property, the restraint imposed by the Illinois statute remains "subject to attack and modification." *In re Marino*, 201 B.R. 234, 248 (Bankr. N.D. Ill. 1996). But without knowing what property exists and where it is located, this Court cannot determine whether such property is subject to attachment, or whether it is exempt under the FSIA. *See Rubin v. The Islamic Republic of Iran*, 637 F.3d 783, 796 (7th Cir. 2011), *as corrected* (Apr. 1, 2011) ("Under the FSIA the only way the court can decide whether it is proper to issue the writ of attachment or execution is if it knows which property is targeted." (citations, internal quotation marks, and alteration omitted)).

The Court also disagrees that Plaintiffs can be required to simply accept Boeing's assertions that no such assets exist or that all available assets are exempt from attachment.[14] *See NML Capital*, 134 S. Ct. at 2257. Instead, Plaintiffs should be permitted to examine the available documents for themselves, and to inquire of an appropriate Boeing employee under oath, to learn the details of the airplane deal and the potential whereabouts of any Iranian assets linked to the deal. *Id.* If Plaintiffs are able to locate any such assets, they will still have to convince this Court—or some other court of competent jurisdiction—that the asset is attachable under the FSIA. But this is not a reason to dismiss the citation outright.

Boeing further argues that using a state statute to "restrain[]the sale of aircraft" to Iran violates "basic principles of federalism" and the Dormant Commerce Clause. (R. 245-1, Boeing's Mem. at 22-24.) This argument appears to be based on Boeing's interpretation of the JCPOA as requiring the U.S. government to actively prevent terror victims holding judgments against Iran from hindering the airplane deal in any manner. (*See* R. 253, Boeing's Reply at 18.)

---

[14] Boeing offers a rather circular argument that Plaintiffs have "failed to provide any basis for doubting the accuracy or completeness of Boeing's extensive submissions establishing that this transaction will not result in any executable assets[.]" (*See* R. 253, Boeing's Reply at 15-16.) It is unclear to the Court how Plaintiffs could do that without examining the contract and other source documents.

Notably, the Executive Branch does not share this reading of the JCPOA. (*See* R. 265, Gov't's Statement at 5 ("[T]he JCPOA does not require the United States to take any specific action with respect to efforts by judgment creditors of Iran to pursue post-judgment discovery or other enforcement proceedings[.]"). But regardless, this Court is not restraining the sale of an aircraft or ordering the turnover of any asset in this order. The Court is only ordering discovery. If and when the case proceeds to the execution stage, Boeing is free to renew its arguments about the propriety of restraining any particular asset identified by Plaintiffs. However, to the extent Boeing is arguing that a state statute must yield whenever a foreign sovereign is involved, the Seventh Circuit recently held to the contrary. *See Baylay v. Etihad Airways P.J.S.C.*, Nos. 16-4113 & 17-1958, 2018 WL 746534, at \*3 (7th Cir. Feb. 7, 2018) ("[T]he [FSIA] preempts any other state or federal law that accords immunity from suit. But it is not intended—and has not been construed—to affect the governing substantive law. Instead, the Act imposes liability on the foreign state in the same manner and to the same extent as a private individual under like circumstances." (citations, internal quotation marks, and emphasis omitted)). For these reasons, Boeing's arguments do not warrant dismissal of the citation.

## IV.    Scope of Discovery Granted

With all that said, the Court does agree with Boeing that Plaintiffs' discovery requests are very broad. (*See* R. 234-6, Boeing's Disc. Objs.) In their document subpoena, for instance, Plaintiffs broadly seek turnover of any and all communications between Boeing and Iran Air "in respect to the Contract." (R. 234-3, Doc. Subpoena ¶ 6.) They also seek any and all "correspondence, notices, written inquires, letters of direction, reports to monitor compliance with reporting requirements, legal processes or writings of any nature and kind whatsoever" between Boeing and OFAC or other agencies of the federal government broadly relating to the

contract or other Iranian assets. (*Id.* ¶ 7.) Plaintiffs also request that they be allowed to ask questions of a Rule 30(b)(6) witness designated by Boeing on these same broadly defined subjects. (R. 234-4, Dep. Subpoena ¶¶ 1-7.)

These requests must be viewed in context: Plaintiffs are seeking information about a multi-million dollar agreement between two sophisticated companies. Their requests, as drafted, are likely to encompass a vast array of information beyond what is needed for them to trace potential assets of Iran. *See NML Capital*, 134 S. Ct. at 2258. Although the federal discovery rules are permissive, they are not "a ticket to an unlimited . . . exploration of every conceivable matter that captures an attorney's interest." *Sapia v. Bd. of Educ. of the City of Chi.*, No. 14 C 7946, 2017 WL 2060344, at *2 (N.D. Ill. May 15, 2017). All discovery must be relevant and proportional to the needs of the case, FED. R. CIV. P. 26(b)(1), and "judges should not hesitate to exercise appropriate control over the discovery process." *Herbert v. Lando*, 441 U.S. 153, 177 (1979). Given the sensitivity of these particular discovery requests, the Court finds it necessary to proceed cautiously.[15]

Weighing the competing interests at stake, the Court will order the production of documents responsive to Paragraphs 1-5 of Schedule A to Plaintiffs' document subpoena. (R. 234-3, Doc. Subpoena ¶¶ 1-5.) This includes the contract itself and other documents that will reveal the existence of any escrow accounts, the details of payment and delivery, and other matters that could potentially lead Plaintiffs to Iranian assets. (*Id.*) The Court makes one minor alteration to Paragraph 1, in which Plaintiffs request "[a] copy of the final signed contract *and all ancillary or supporting documents*." (*Id.* ¶ 1 (emphasis added).) The Court finds the highlighted language unduly vague. Instead, Boeing will be ordered to produce the final signed contract and

---

[15] The Court notes that it has already approved an agreed protective order that the parties can invoke to shield confidential or sensitive information from public disclosure. (*See* R. 226, Stipulated Protective Order.)

*all exhibits or appendices thereto, if any.* As to Paragraph 7, the Court finds the request as

drafted extremely broad in subject matter and temporal scope and will limit it as follows: Boeing

is ordered to produce any and all written communications between Boeing and OFAC relating to

the airplane contract with Iran Air. The Court declines to order production of the documents

listed in Paragraph 8 as unduly broad, disproportionate to the needs of this case, and duplicative

of other requests that are more narrowly tailored to tracing Iran's assets.

The Court further orders Boeing to designate a Rule 30(b)(6) witness to address the

matters designated in Paragraphs 1-5 of Schedule A to Plaintiffs' deposition subpoena, which

correspond to the documents the Court has ordered Boeing to disclose.[16] (R. 234-4, Dep.

Subpoena ¶¶ 1-5.) The Court finds Paragraph 6 overly broad, disproportionate to the needs of the

case, and duplicative of other requests that are more narrowly tailored to tracing potential assets

of Iran. As to Paragraph 7, consistent with the modification made above, Plaintiffs shall only be

permitted to inquire into the details of communications between Boeing and OFAC relating to

the airplane contract with Iran Air. Any other relief requested in Plaintiffs' motion to compel is

denied.

---

[16] Boeing makes a rather cryptic objection that it "does not employ any person who is suitable to serve as a Rule 30(b)(6) representative within 100 miles of the district." (R. 234-5, Boeing's Disc. Objs. at 7.) Boeing does not elaborate on this objection in its briefs, and the objection may have been obviated by the Court's limitation on the scope of the deposition. But Boeing is reminded that under Rule 30(b)(6), "a corporation has a duty . . . to designate an individual to testify who has knowledge responsive to the subjects requested in the Rule 30(b)(6) notice." *In re Fluidmaster, Inc., Water Connector Components Prods. Liab. Litig.*, No. 1:14-CV-05696, 2018 WL 505089, at *6 (N.D. Ill. Jan. 22, 2018) (citation and internal quotation marks omitted). "The persons designated must testify about information known or reasonably available *to the organization.*" *Id.* (emphasis in original) (citing FED. R. CIV. P. 30(b)(6)); *see also Fed. Deposit Ins., Corp. v. Giancola*, No. 13 C 3230, 2015 WL 5559804, at *2 (N.D. Ill. Sept. 18, 2015) ("The designating party has a duty to prepare the witness to testify on matters not only known by the deponent, but also as to those that should be reasonably known by the designating party."). If necessary, Boeing must designate multiple witnesses to cover the topics listed. *In re Fluidmaster*, 2018 WL 505089, at *6. The Court trusts that a large, sophisticated corporation like Boeing will comply with its discovery obligations under the Federal Rules.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion to compel (R. 232) is GRANTED in part and DENIED in part as stated herein. The Boeing Company's cross-motion to quash and to dismiss the citation to discover assets (R. 245) is DENIED. Boeing shall disclose all responsive documents as outlined in this order on or before April 2, 2018, and shall submit to a Rule 30(b)(6) deposition on or before May 2, 2018. The citation to discover assets shall remain in effect until further order of the Court. The parties shall appear for a status hearing on May 10, 2018, at 9:45 a.m. They are directed to reconsider their respective positions in light of this order and to exhaust all efforts to reach an agreed resolution of any remaining discovery disputes.

ENTERED:

**Chief Judge Rubén Castillo**
**United States District Court**

**Dated: February 27, 2018**